SIMULA, INC., an Arizona corporation; Simula Automotive Safety Devices, Inc., an Arizona corporation, Plaintiffs–Appellants,

v.

AUTOLIV, INC., a Delaware corporation; Autoliv, AB, a Swedish corporation; Autoliv Development GMBH, a German corporation; Autoliv ASP, INC., an Indiana corporation; Autoliv North America, Inc., a Delaware corporation, Defendants–Appellees.

No. 98–16563.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1999.

Filed April 30, 1999.

John H. Cotton, Scottsdale, Arizona, and John Alan Doran, Bryan Cave, Phoenix, Arizona, for the plaintiffs-appellants.

Peter E. Greene, Skadden, Arps, Slate, Meagher & Flom, New York, New York, for the defendants-appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and FITZGERALD, District Judge.*

TASHIMA, Circuit Judge:

This appeal presents the question of how broadly an arbitration clause containing the phrase "arising in connection with this Agreement" should be construed. The district court held that it encompassed all disputes having their origin or genesis in the contract and granted appellees' motion to compel arbitration. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.

In 1992, Simula, Inc., and Simula Automotive Safety Devices, Inc. (together "Simula"), invented the Inflatable Tubular Structure ("ITS"), an automotive side impact head protection air bag system. In 1993, Simula approached BMW, a German automaker, about purchasing the ITS. BMW instructed Simula to work through Autoliv, AB, and its subsidiaries, Autoliv, Inc., Autoliv Development GMBH, Autoliv ASP, Inc., and Autoliv North America (collectively "Autoliv"), a previously-approved "first-tier" vendor/supplier of automotive components, to present Simula's technology for incorporation into BMW's cars.

As directed by BMW, Simula approached Autoliv about the ITS technology. In May 1993, Autoliv and Simula signed nondisclosure agreements. Thereafter, Simula disclosed to Autoliv confidential, proprietary, and trade secret information regarding the ITS, as well as testing data illustrating the enhanced safety advantages it offered.

In January 1994, Autoliv and Simula signed a letter of intent outlining the proposed relationship between them. Under the proposal, Simula would manufacture the ITS and give a conditional license of confidential, proprietary, and trade secret technology to Autoliv. In return, Autoliv would integrate the ITS into the BMW automobile. Autoliv was to pay Simula for each ITS unit delivered by Simula to Autoliv and pay royalties on the sales of the ITS integrated systems. In July 1994, Autoliv received a contract and a sum of money from BMW to fund a portion of the ITS integration cost.

In August 1994, with Simula's permission, Autoliv presented the Simula ITS system to Mercedes Benz. Because BMW and Mercedes Benz were head-to-head competitors and viewed one another as leaders in European automotive safety, Mercedes Benz suggested to Autoliv that it begin development of a product that differed from the ITS. Autoliv agreed. As Simula alleges, Autoliv subsequently began to replicate features of the ITS into a competing "inflatable curtain," accelerated its efforts to develop the inflatable curtain as a competitive "first-to-the-market" product, and undertook a scheme to disparage the ITS to automotive manufacturers and to represent favorably the qualities of Autoliv's own side protective technology.

In September 1994, Autoliv made a presentation to the Mercedes Benz and Ford Motor Companies regarding the ITS. Simula alleges that Autoliv knowingly presented inaccurate test data and false, misleading, and disparaging information concerning the ITS system. At the same time, however, Autoliv committed to BMW and Simula to provide the ITS on BMW automobiles.

In January 1995, Simula and Autoliv entered into three related agreements including: (1) a Joint Development and Cooperation Agreement; (2) a Licensing Agreement; and (3) a Frame Supply Agreement (collectively, the "1995 Agreement"). At the time that Simula signed the agreements, Simula did not know of and Autoliv did not disclose its inflatable

---

* The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

curtain concept. Under the Joint Development and Cooperation Agreement and the Frame Supply Agreement, the first customer project between Simula and Autoliv was BMW. Under the Licensing Agreement, Autoliv maintains it acquired the exclusive rights to all marketing and sales of any ITS system for all automobile manufacturers and that Simula may not market the ITS itself.

In February 1998, Simula brought suit against Autoliv alleging causes of action for: (1) violation of the Sherman Act, 15 U.S.C. § § 1 and 2; (2) violation of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125; (3) misappropriation of trade secrets and breach of the non-disclosure agreements; (4) defamation; and (5) breach of the Arizona Trade Secrets Act, Ariz.Rev.Stat. § 44–401. Simula sought preliminary and permanent injunctive relief, treble damages for antitrust violations, punitive damages, compensatory damages, attorney's fees, and costs.

Autoliv moved to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4, and either to dismiss the complaint or stay the action pending the resolution of arbitration proceedings. The district court granted Autoliv's motion to compel arbitration and its motion to dismiss. It held that all of Simula's claims against Autoliv were subject to the arbitration clause contained in the 1995 Agreement because all of Simula's claims relate to, derive from, and arise in connection with that contract. Simula appeals.

## II.

■ Determinations of arbitrability, like the interpretation of any contractual provision, are subject to de novo review. *See Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 474 (9th Cir.1991); *Mediterranean Enter., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1462–63 (9th Cir. 1983). Therefore, we review de novo the district court's interpretation of the contract language in the parties' 1995 Agreement.

■ Federal substantive law governs the question of arbitrability. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Republic of Nicaragua*, 937 F.2d at 474–75. The FAA reflects Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. *See Republic of Nicaragua*, 937 F.2d at 475 (citing *Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)). The FAA embodies a clear federal policy in favor of arbitration.[1] "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927.

■ The standard for demonstrating arbitrability is not high. The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. *See Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Such agreements are to be rigorously enforced. *See id.* at 221, 105 S.Ct. 1238. Under § 4 of the FAA,[2] the

---

1. 9 U.S.C. § 2 provides, in pertinent part:
 A written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

2. 9 U.S.C. § 4 provides, in pertinent part:
 The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration … is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement … If the making of the arbitration agreement

district court must order arbitration if it is satisfied that the making of the agreement for arbitration is not in issue. Therefore, the district court can determine only whether a written arbitration agreement exists, and if it does, enforce it in accordance with its terms. *See Howard Elec. & Mech. v. Briscoe Co.*, 754 F.2d 847, 849 (9th Cir.1985).

■ We must first determine the breadth of the disputed arbitration clauses. The three arbitration clauses in the 1995 Agreement identically state in relevant part:

> *All disputes arising in connection with this Agreement* shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said rules.

(Emphasis added.) Although we have not yet construed this precise language, we have expansively interpreted similar language and other courts have construed identical language liberally.

In *Republic of Nicaragua*, relying on *Mediterranean Enter.* and *Moses H. Cone*, we held that an arbitration clause containing the phrase "any and all disputes arising under the arrangements contemplated hereunder" must be interpreted liberally. *See Republic of Nicaragua*, 937 F.2d at 479. We concluded that the lower court's narrow interpretation of the clause conflicted with the strong federal policy favoring arbitral dispute resolution, one which applied with special force in the field of international commerce. *See id.* at 478 (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)

(other citations omitted)). Although we acknowledged that we were interpreting language in the arbitration agreement that was similar to that in *Mediterranean Enter.*, we ultimately compelled arbitration under the admonition of *Moses H. Cone* to construe arbitration clauses expansively.[3] *See id.* at 479. *See also Prograph Int'l Inc. v. Barhydt*, 928 F.Supp. 983, 989 (N.D.Cal.1996) (interpreting virtually identical language expansively).

Other courts have also liberally construed arbitration agreements containing language identical to the parties' arbitration clause. In *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir.1988), the court held that an arbitration agreement providing that "[a]ll disputes arising in connection with the present contract shall be finally settled" by arbitration was sufficiently broad in scope to include claims for unfair trade practices, libel, and defamation. *See id.* at 321. The Fourth Circuit reasoned that "[t]he recommended clause does not limit arbitration to the literal interpretation or performance of the contract. It embraces every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.*

Likewise, in *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515 (10th Cir.1995), the Tenth Circuit held that an arbitration clause covering "any dispute arising in connection with the implementation, interpretation or enforcement" of a license agreement was sufficiently broad to cover antitrust disputes between the parties. The Tenth Circuit concluded that, among other things, the public policy in favor of arbitration compelled it to read

---

... be in issue, the court shall proceed summarily to the trial thereof.

**3.** Simula cites both *Mediterranean Enter.* and *Tracer Research Corp. v. National Envt'l Servs. Co.*, 42 F.3d 1292 (9th Cir.1994), to support its contention that the disputed arbitration clause should be narrowly construed. Neither of these cases, however, controls the language in the present clause: *Mediterranean*

*Enter.* interpreted a clause providing for any disputes "arising hereunder," *see* 708 F.2d at 1464, and *Tracer Research* involved an arbitration clause providing for arbitration of claims "arising out of" the agreement, *see* 42 F.3d at 1295. Such language is considerably more narrow in scope than the language at issue here.

the arbitration clause to include the antitrust disputes. *See id.*

Finally, in *Good(E) Bus. Sys., Inc. v. Raytheon Co.,* 614 F.Supp. 428, 429 (W.D.Wis.1985), the court held that an arbitration clause providing for arbitration of disputes "arising in connection with" the agreement was broad enough to cover all claims of misrepresentation. The court there rejected an argument that the arbitration clause should be narrowly construed, concluding that "the plain meaning of the phrase 'arising in connection with' suggests a broader scope than a phrase such as 'arising out of' or 'arising under,' which seem to limit the clause to disputes concerning the contract itself." *Id.*

Every court that has construed the phrase "arising in connection with" in an arbitration clause has interpreted that language broadly. We likewise conclude that the language "arising in connection with" reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.

### III.

To require arbitration, Simula's factual allegations need only "touch matters" covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability. *See Mitsubishi Motors,* 473 U.S. at 624 n. 13, 105 S.Ct. 3346 (noting that "insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, [we] properly resolve[ ] any doubts in favor of arbitrability"); *Genesco, Inc. v. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir.1987) (holding that if factual allegations touch matters covered by agreements, then claims must be arbitrated). Accordingly, we must examine the factual allegations raised to determine which of Simula's causes of action are arbitrable. *See J.J. Ryan & Sons,* 863 F.2d at 319 (stating that court must determine whether factual allegations underlying claim are within scope of arbitration clause).

### A. Antitrust Claims

Simula brought two claims under the Sherman Act, 15 U.S.C. §§ 1 and 2, alleging that: (1) the January 1995 licensing agreement unreasonably restrains trade in the development, marketing and selling of automobile side-impact neck and head protection systems; and (2) Autoliv possesses significant monopoly power in the side-impact protection system markets. Contending that its antitrust claims do not fall within the scope of the arbitration clause, Simula argues that to hold otherwise would fail to protect the public policy interests promoted by United States antitrust law.

Both the Supreme Court and this court have held that antitrust claims are arbitrable. *See Mitsubishi Motors,* 473 U.S. at 632–35, 105 S.Ct. 3346; *Nghiem v. NEC Elec., Inc.,* 25 F.3d 1437, 1441 (9th Cir. 1994). In *Mitsubishi Motors,* the Supreme Court acknowledged the importance of antitrust remedies, with their provision for treble-damages, but concluded that the importance of the private damages remedy did not compel the conclusion that it may not be sought outside an American court. *See Mitsubishi Motors,* 473 U.S. at 635, 105 S.Ct. 3346.

Here, Simula accuses Autoliv of anticompetitive conduct, creating a monopoly by illicit means, and unreasonably restraining trade, the effects of which damage Simula and cause adverse competitive effects with negative impact on the safety interests of United States citizens. Simula suggests that the 1995 Agreement is a primary reason why competition in the market for side impact neck and head protection systems has been suppressed. In short, Simula accuses Autoliv of using the 1995 Agreement as an anti-competitive tool to restrain trade, to the detriment of itself and U.S. automobile drivers in general.

Similar antitrust claims were made in *PPG Indus., Inc. v. Pilkington PLC,* 825

F.Supp. 1465 (D.Ariz.1993), in which the plaintiffs alleged Sherman Act violations for monopolization and attempted monopolization of the flat glass market and the defendants' use of the license agreement as an anti-competitive tool. *See id.* at 1478. In determining whether the arbitration agreement was broad enough to include the alleged antitrust violations the court stated:

> The Court will necessarily have to interpret or ascertain the meaning of the Agreement to determine if [the defendant] has misused the Agreement's restraints in the manner alleged. The clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes.

*Id.* (citations and quotations omitted).

Likewise, resolution here of Simula's antitrust claims will necessitate interpreting the 1995 Agreement to determine its meaning and whether the contracts between Autoliv and Simula actually do suppress competition as alleged. The same reasoning applies to the allegations of improper marketing and disparaging remarks, as these disputes also implicate Autoliv's performance under the 1995 Agreement as the exclusive dealer of Simula's ITS system. All of the agreements between Autoliv and Simula would have to be closely examined in order to determine whether Autoliv performed its contractual obligations in a manner consistent with the various agreements. This job is for the arbitrator, however, not for the courts. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

Simula additionally contends that public policy regarding antitrust law requires us to reverse the district court. Relying on *Mitsubishi Motors*, Simula claims that the choice-of-law provisions and the arbitration clauses in this case violate public policy because there is a likelihood that the Swiss Arbitral Tribunal will not apply American antitrust law, to the profound and irrevocable detriment of United States automotive safety and the national interest in open and competitive markets.

Mitsubishi Motors considered whether an American court should enforce an agreement to resolve antitrust claims by arbitration when the agreement arose from an international transaction. *See* 473 U.S. at 624, 105 S.Ct. 3346. Eschewing a provincial solicitude for domestic forums, the Court concluded that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes" required that it enforce the parties' agreement to arbitrate. *Id.* at 629, 105 S.Ct. 3346. The Court took pains to emphasize that the liberal federal policy favoring arbitration applies with particular force in the field of international commerce:

> A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages ... [It would] damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.

*Id.* at 631, 105 S.Ct. 3346 (citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516–17, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)) (quotations omitted).

The Court did acknowledge the fundamental importance of antitrust law to American democratic capitalism, as well as the Sherman Act's "important incidental policing function" protecting the public's interest. *See id.* at 635, 105 S.Ct. 3346. The Court ultimately concluded, however, there was no reason to assume, at the outset of a dispute, that international arbitration would not offer an adequate mecha-

nism to vindicate statutory causes of action. *See id.* at 636, 105 S.Ct. 3346.

Simula contends that enforcement of the arbitration clause will deprive it of remedies provided solely by United States antitrust law. It argues that the *Mitsubishi Motors* Court disapproved of such an outcome when it noted that "in the event the choice-of-forum and choice-of-law clauses operate[ ] in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. 3346.

We have, however, indicated that we do not consider that footnote to be binding: "we do not believe dictum in a footnote regarding antitrust law outweighs the extended discussion and holding in *Scherk* on the validity of clauses specifying the forum and applicable law." *Richards v. Lloyd's of London,* 135 F.3d 1289, 1295 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 365, 142 L.Ed.2d 301 (1998).

In *Richards,* we upheld a forum selection clause and transferred the dispute to a British court, despite the fact that the plaintiffs' federal statutory claims would not be available under British law. *See id.* at 1294. We held that the applicable standard should be whether the law of the transferee court is so deficient that the plaintiffs would be deprived of any reasonable recourse. *See id.* at 1296. Applying that standard to this dispute, we find that the law applied by the Swiss Arbitral Tribunal would afford sufficient antitrust remedies.[4]

Simula's claim that the Tribunal would not provide the identical relief of an United States court is similarly unavailing. Under *Richards,* remedies in a foreign forum need not be identical; to require

that "American standards of fairness ... must govern the controversy demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries." *See id.* at 1295 (quotations omitted) (citing *Scherk,* 417 U.S. at 517 n. 11, 94 S.Ct. 2449).

Accordingly, we require "this representative of the American business community to honor its bargain," *Mitsubishi Motors,* 473 U.S. at 640, 105 S.Ct. 3346, and hold that the antitrust claims are fully arbitrable.

**B. Lanham Act Claims**

Simula alleges that under the Lanham Act, 15 U.S.C. § 1125, Autoliv intentionally made false and misleading representations while promoting Simula's ITS system. Simula contends that its Lanham Act claims are not arbitrable because they are separate tort claims relating to conduct occurring prior to the date on which the parties entered into the arbitration clause. Therefore, Simula argues, the claims are governed by the parties' previous agreements, the 1993 nondisclosure agreement and January 1994 letter of intent.

The 1995 Agreement, however, effectively subsumed the prior contracts: "[The Agreement] constitutes the entire understanding and agreement. Any other previous negotiations, discussions *and written or oral agreements* between the parties on the subject matter of this Agreement are superseded hereby." (Emphasis added.) Thus any obligation of Autoliv under the 1993 nondisclosure agreement and January 1994 letter of intent was incorporated into the 1995 Agreement under the merger clause, and is subject to the arbitration clause.

---

4. In fact, it is possible that the Swiss Tribunal might apply U.S. antitrust law to the dispute. Although Simula offers the declaration of a Swiss legal expert to support its claim that U.S. antitrust law will not be applied, the expert also declared that the Swiss Tribunal is likely to apply U.S. law in situations affecting U.S. markets. Moreover, even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection.

Further, the alleged misrepresentations relate directly to Autoliv's capacity as the exclusive dealer of Simula's ITS system under the 1995 Agreement; all the disparagement claims pertain to statements made regarding the ITS in the course of Autoliv's promotional efforts. Therefore, resolving Simula's factual allegations against Autoliv requires interpreting Autoliv's performance and conduct under the 1995 Agreement.

Courts have routinely held that claims falling under the Lanham Act are arbitrable. *See Doctor's Assoc., Inc. v. Distajo,* 107 F.3d 126, 133 (2d Cir.1997); *Gingiss Int'l, Inc. v. Bormet,* 58 F.3d 328, 332 (7th Cir.1995). *See also Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (holding that the FAA mandates enforcement of agreements to arbitrate statutory claims).[5] Accordingly, we hold that because Simula's claims of false and misleading representation under the Lanham Act relate directly to the 1995 Agreement, they are subject to arbitration.

**C. Defamation**

■ Simula alleges that Autoliv made false, malicious, and defamatory statements about Simula, its engineering staff and its products in public fora. These statements, Simula contends, prejudice it in the conduct of its business, deter others from dealing with it, and have defamed its reputation.

Like its Lanham Act claims, Simula's defamation claims hinge upon the allegedly false statements made by Autoliv about the ITS system. Simula's defamation claims are similarly referable to arbitration because the purported defamatory conduct arose out of Autoliv's performance as exclusive distributor of the ITS system, a performance which is controlled by the arbitration clause in the 1995 Agreement.

Simula's assertion that Autoliv improperly marketed the ITS, and that this improper marketing included Autoliv's purposeful defamation of Simula's product, is integrally related to Autoliv's duties to use its "best endeavors" to sell the ITS under the 1995 Agreement.

We have held that defamation claims are arbitrable if the claim arises out of the agreement. *See Saari v. Smith Barney, Harris Upham & Co.,* 968 F.2d 877, 883 (9th Cir.1992); *Zolezzi v. Dean Witter Reynolds, Inc.,* 789 F.2d 1447, 1450 (9th Cir.1986). *See also McMahon v. RMS Elec., Inc.,* 618 F.Supp. 189, 191 (S.D.N.Y. 1985) (holding that when tort claim is based in substantial part on contractual rights and responsibilities of parties, then it must be arbitrated as required by clause). Therefore, we hold that Simula's defamation claims are arbitrable.

**D. Misappropriation of Trade Secrets/Breach of Nondisclosure Agreements/Breach of Arizona Trade Secrets Act**

■ Simula alleges that Autoliv, by wrongfully using confidential information to manufacture Autoliv's competing inflatable curtain, breached the May 1993 nondisclosure agreements, misappropriated trade secrets, and violated the Arizona Uniform Trade Secrets Act, Ariz.Rev.Stat. § 44–401. Simula argues that these claims fall outside the scope of the arbitration clauses because they are separate tort claims, based not on rights and remedies under the 1995 Agreement, but upon separate, independent statutory and common law prohibitions.

Simula relies upon the violation of the May 1993 nondisclosure agreements as the basis for its misappropriation of trade secrets claim. As with its Lanham Act claims, however, those nondisclosure agreements were a key part of the 1995

---

5. Simula argues that *Desktop Images, Inc. v. Ames,* 929 F.Supp. 1339 (D.Colo.1996) dictates that claims under the Lanham Act are not arbitrable. The arbitration clause in *Desktop Images,* however, was considerably more narrow than the 1995 Agreement (contract provided for arbitration of claims "arising thereunder"), *see id.* at 1345.

Agreement, which expressly prohibited the misuse of proprietary information, including technical information and trade secrets. If Autoliv had fully complied with the contract, as interpreted by Simula, there would be no tort claims. Thus Simula's claims will necessitate a review of the contracts between Autoliv and Simula to determine whether Autoliv improperly breached the nondisclosure agreements and misappropriated trade secrets.

Further, it is unlikely that without the disclosure agreements, Simula would have ever dealt with Autoliv. Indeed, the entire business relationship between Simula and Autoliv was dependent, in part, on the rights and obligations under the nondisclosure agreements and reaffirmed by the 1995 Agreement. Autoliv gained access to Simula's confidential and proprietary information because of the parties' contractual relationship. Although the nondisclosure agreements themselves do not have arbitration clauses, they are a significant part of the business relationship between Simula and Autoliv which was subsumed by the 1995 Agreement, and thus subject to arbitration.

Courts routinely refer claims for misappropriation of trade secrets to arbitration. *See, e.g., Mitsubishi Motors,* 473 U.S. at 627, 105 S.Ct. 3346 (holding that claims based on statutory rights can be subject to arbitration); *McMahan Sec. Co., L.P. v. Forum Capital Mkts. L.P.,* 35 F.3d 82, 88 (2d Cir.1994) (finding claims of trade secret misappropriation arbitrable). Although this court, in *Tracer Research,* found that a claim of trade secret misappropriation was not arbitrable under the parties' agreement, the language of that arbitration clause was much narrower in scope than the 1995 Agreement, and had no provisions addressing the use of the proprietary information. *See id.,* 42 F.3d at 1295. Contrary to Simula's contentions, *Tracer Research* does not prohibit the arbitration of *all* trade secret misappropriation claims, but merely the arbitration of

such claims under similarly narrow clauses. *See id.*

Accordingly, we hold that Simula's claims of trade secret misappropriation are dependent on the 1995 Agreement and subject to arbitration.

**IV.**

 Simula contends that the district court abused its discretion in denying its request for a preliminary injunction. A preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury. *See Big Country Foods, Inc. v. Board of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989). The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *See FDIC v. Garner,* 125 F.3d 1272, 1276 (9th Cir.1997), *cert. denied,* ⸺ U.S. ⸺, 118 S.Ct. 1299, 140 L.Ed.2d 466 (1998).

 The district court correctly denied Simula's request for a preliminary injunction, since provisional relief is available from the Swiss Arbitral Tribunal. On their face, the International Chamber of Commerce ("ICC") Rules of Arbitration hold that the Arbitral Tribunal can provide interim and/or conservatory relief:

> Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate.... Any such measures shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

ICC Rules of Arb., Art. 23, ¶ 1. Therefore, Simula is incorrect in asserting that preliminary injunctive relief should have been granted by the district court because the arbitrators cannot grant such relief. On this basis alone, the district court did not

abuse its discretion in denying Simula's request for a preliminary injunction.

Because the district court correctly concluded that all of Simula's claims were arbitrable and the ICC arbitral tribunal is authorized to grant the equivalent of an injunction *pendente lite,* it would have been inappropriate for the district court to grant preliminary injunctive relief. Therefore, we affirm the district court's denial of preliminary injunctive relief.

## V.

■ Simula contends that the district court erred in finding that Simula was not entitled to pre-arbitration discovery and denying the motion as moot. We review the district court's rulings concerning discovery for an abuse of discretion. *See Garneau v. City of Seattle,* 147 F.3d 802, 812 (9th Cir.1998).

■ The FAA provides for discovery and a full trial in connection with a motion to compel arbitration only if "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue." 9 U.S.C. § 4. In *Prima Paint,* the Supreme Court held that in passing upon an application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. *See* 388 U.S. at 404, 87 S.Ct. 1801; *see also Sparling v. Hoffman Construction Co.,* 864 F.2d 635, 638 (9th Cir.1988) (noting that under *Prima Paint,* fraud claims must be submitted to arbitration unless arbitration clause itself was fraudulently induced).

Simula asserts that it has repeatedly alleged that the 1995 Agreement itself may have been procured as a result of fraudulent inducement. A review of Simula's complaint, however, reveals only one possible prior assertion of fraudulent inducement, and this is construing the assertion generously. Simula may not assert this claim for the first time on appeal. *See*

*Gonzales v. Parks,* 830 F.2d 1033, 1037 (9th Cir.1987).

Even if Simula did assert its fraud claim previously, fraud in the inducement and economic duress of the 1995 Agreement as a whole, such as Simula seems to be asserting in its complaint, are questions for the arbitrator. *See Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. 1801. Accordingly, we affirm the district court's denial of Simula's discovery motion.

## VI.

Simula contends that the district court erroneously based its legal conclusions on factual findings unsupported by the record rather than the allegations in the complaint. This contention lacks merit. The record, including Simula's complaint, fully supports the district court's factual findings. Further, despite Simula's claims, nothing in the record indicates that the district court did not take all of Simula's factual allegations as true, as required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the motion to dismiss.

## VII. Conclusion

As the Supreme Court has made abundantly clear, the emphatic federal policy in favor of arbitral dispute resolution applies with special force in the field of international commerce. The broadly-worded arbitration clause mandates the submission of these claims to arbitration. Accordingly, we affirm the district court's order compelling arbitration and dismissing Simula's complaint.

**AFFIRMED.**