**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAPE FLATTERY LIMITED,
            *Plaintiff-Appellee,*

v.

TITAN MARITIME, LLC, a Crowley
Company, DBA Titan Salvage,
            *Defendant-Appellant.*

No. 09-15682

D.C. No.
1:08-cv-00482-JMS-
KSC

OPINION

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
February 17, 2011—Honolulu, Hawaii

Filed July 26, 2011

Before: A. Wallace Tashima, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Steven M. Egesdal, Nenad Krek, Erika Leina Togashi Lewis, Duane Richard Miyashiro, CARLSMITH BALL LLP, Honolulu, Hawaii, Eugene J. O'Connor, CHALOS O'CONNOR & DUFFY LLP, Port Washington, New York, for the appellee.

John Robert Lacy, GOODSILL ANDERSON QUINN & STIFEL, Honolulu, Hawaii, Albert A. Peacock, James Arthur Henry Marissen, KEESAL, YOUNG & LOGAN, Long Beach, California, for the appellant.

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiff Cape Flattery Limited ("Cape Flattery") sued Defendant Titan Maritime ("Titan") for gross negligence in its salvage of Cape Flattery's vessel, the M/V Cape Flattery. Titan appeals the district court's decision denying its motion to compel arbitration of the dispute under the Federal Arbitration Act ("FAA"). Titan argues that the district court erred in refusing to apply English arbitrability law. Titan further argues that even under federal arbitrability law, the dispute is arbitrable. We conclude that federal arbitrability law applies, and that under federal arbitrability law the dispute is not arbitrable. We therefore affirm the district court.

## I.    Background

On February 2, 2005, the M/V Cape Flattery ran aground on a submerged coral reef off Barbers Point, Oahu, Hawai'i.

*Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp. 2d 1179, 1181 (D. Hawai'i 2009). In response, the U.S. Coast Guard issued a Notice of Federal Interest in connection with the vessel's grounding and activated Unified Command to respond to the threat of potential oil discharge. *Id.* Under 33 U.S.C. § 2702, Cape Flattery, as the vessel's owner, was liable for the cost of removing the vessel from the reef. 33 U.S.C. §§ 2701(32)(A); 2702(a). Cape Flattery entered into an agreement with Titan Maritime to salvage the vessel (the "Agreement"). *Cape Flattery*, 607 F. Supp. 2d at 1181.

Under the Agreement, Titan agreed:

> to use its best endeavors to salve, as quickly as reasonably practicable, the [M/V Cape Flattery] by means of the personnel and equipment specified in Schedule 2, and/or such other personnel and/or equipment as may from time to time be agreed between Titan and the on-site Owners' Representative . . . and deliver the [M/V Cape Flattery] to a Place of Safety.

Schedule 2 provides a list of Titan's "Typical Daily Personnel & Equipment Rates."

The Agreement also contains an arbitration clause. The clause, titled "Arbitration," provides:

> Any dispute arising under this Agreement shall be settled by arbitration in London, England, in accordance with the English Arbitration Act 1996 and any amendments thereto, English law and practice to apply.

Titan succeeded in removing the M/V Cape Flattery from the reef and eliminating the threat of oil discharge. *Id.* at 1181. At some point in the M/V Cape Flattery's grounding or removal, however, serious damage was inflicted on the reef.

Under 33 U.S.C. § 2702(b)(2), Cape Flattery is liable to the United States government for all damage to natural resources resulting from the grounding. *See id.* § 2702(a) ("[E]ach responsible party for a vessel . . . which poses the substantial threat of a discharge of oil . . . is liable for the damages specified in subsection (b) of this section that result from such incident."); *id.* § 2701(32)(A) (owner of vessel is a responsible party); *id.* § 2702(b)(2)(A) (damages recoverable under § 2702(a) include "[d]amages for injury to [or] destruction of . . . natural resources . . . , which shall be recoverable by a United States trustee"). On August 8, 2008, the government informed Cape Flattery that it would likely be liable for damages in excess of $15 million. *Cape Flattery*, 607 F. Supp. 2d at 1182.

On October 24, 2008, Cape Flattery filed a complaint in the federal district court for the District of Hawai'i against Titan, seeking indemnity and/or contribution based on the damage Titan allegedly caused through gross negligence in removing the M/V Cape Flattery from the reef. *See* 33 U.S.C. § 2709 ("A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."); *id.* § 1321(c)(4) (parties rendering "care, assistance, or advice" in removing vessels only liable when "grossly negligent"). The complaint also sought to enjoin Titan from requesting arbitration.

On December 17, 2008, Titan filed a motion to compel arbitration based on the arbitration clause in the Agreement. *Cape Flattery*, 607 F. Supp. 2d at 1182. On March 19, 2009, after several rounds of briefing and a hearing, the district court denied the motion. The court first rejected Titan's argument that English law governed the arbitrability of the dispute. *Id.* at 1184-85. The court concluded that under *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985), federal arbitrability law applies to determine arbitrability. *Cape Flattery*, 607 F. Supp. 2d at 1184. The court noted the legal uncertainty concerning

whether federal arbitrability law allows parties to agree to apply non-federal arbitrability law. *Id.* It concluded that even if parties are allowed to contract out of federal arbitrability law, the parties in this case had not done so. *Id.* at 1185.

The district court then concluded that under federal arbitrability law, the current dispute did not "aris[e] under" the Agreement. *Id.* at 1185-92. It first concluded that under our decisions in *Mediterranean Enterprises, Inc. v. Ssangyong Construction Co.*, 708 F.2d 1458 (9th Cir. 1983), and *Tracer Research Corp. v. National Environmental Services Co.*, 42 F.3d 1292 (9th Cir. 1994), the "arising under" language in the Agreement signifies a narrow arbitration agreement. *Cape Flattery*, 607 F. Supp. 2d at 1185-86. Under these cases, claims that relate "only peripherally" to the Agreement are not arbitrable. *Id.* at 1188 (quoting *Tracer*, 42 F.3d at 1295). The district court then held that because Titan's duty to prevent foreseeable damage to the coral reef is based on a federal statute and is thus "separate from and above and beyond Defendant's duties under the Agreement," *id.* at 1190-91, Cape Flattery's tort claims against Titan are not arbitrable.

Denials of motions to compel arbitration are immediately appealable under 9 U.S.C. § 16(a)(1)(B) and (C). Titan timely appealed.

## II.   Standard of Review

We review the district court's decision on a motion to compel arbitration *de novo*. *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1152 (9th Cir. 2004). We review a district court's choice-of-law decision *de novo*. *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936 (9th Cir. 2001). We also review the validity and scope of an arbitration clause *de novo*. *Moore v. Local 569 of Int'l Bhd. of Elec. Workers*, 53 F.3d 1054, 1055 (9th Cir. 1995). We review the factual findings underlying the district court's decision for clear error. *Bradley v. Harris Research Inc.*, 275 F.3d 884, 888 (9th Cir. 2001).

### III.    Discussion

Titan argues that the district court erred in deciding that federal arbitrability law applies, and in its application of that law. We address Titan's arguments in turn.

### A.    Choice of Arbitrability Law

The first issue is what law applies to determine the arbitrability of the dispute. Titan argues that the Agreement's provision that "[a]ny dispute arising under this Agreement shall be settled by arbitration in London, England, in accordance with the English Arbitration Act 1996 and any amendments thereto, English law and practice to apply" constitutes an agreement that English law applies to determine the arbitrability of a dispute. Cape Flattery argues that parties cannot contract out of federal arbitrability law, and that even if they can, the parties did not do so in the Agreement.

**[1]** The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). Neither the Supreme Court nor this court has decided whether federal arbitrability law allows contracting parties to agree to apply a non-federal law of arbitrability to interpret a given arbitration agreement. If the parties can agree to apply a non-federal arbitrability law, it is also undecided how courts should determine whether the parties have so agreed.

### 1.    Parties' Power To Agree To Non-Federal Arbitrability Law

In defending their respective positions regarding the power of contracting parties to agree to a non-federal arbitrability law, Cape Flattery and Titan rely on different Supreme Court decisions. Cape Flattery relies on *Mitsubishi Motors*. Mitsu-

bishi and Soler entered into a sales agreement that included the following arbitration clause: "All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to . . . this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." 473 U.S. at 617 (first two alterations in original). When a dispute arose, Soler sued Mitsubishi alleging, among other things, violations of the Sherman Act. *Id.* at 619-20. In determining whether the dispute was arbitrable, the Supreme Court stated: "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].' " *Id.* at 626 (quoting *Moses H. Cone*, 460 U.S. at 24).

Cape Flattery argues that because *Mitsubishi* does not suggest any exception to the application of federal arbitrability law, courts should always apply federal arbitrability law to determine the arbitrability of a given dispute. It notes that district courts, including the district court in this case, have suggested, without directly holding, that federal arbitrability law may apply despite an agreement to apply non-federal arbitrability law. *See Cape Flattery*, 607 F. Supp. 2d at 1185 (suggesting that there may be "a bright-line rule that the court should apply federal law in determining arbitrability of an agreement governed by . . . the FAA regardless of any choice-of-law provision"); *Chloe Z Fishing Co., Inc. v. Odyssey Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1252 (S.D. Cal. 2000) (holding that for agreements covered by the FAA, the FAA provides an " 'overriding basis' for why the law under which the case 'arises' . . . must apply to the question of whether these parties agreed to arbitrate their disputes").

**[2]** Titan does not contest that federal arbitrability law applies generally, but argues that federal arbitrability law

requires courts to enforce contracting parties' agreement to apply non-federal arbitrability law. Titan relies primarily on *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468 (1989). In *Volt*, the parties agreed to arbitrate any disputes pursuant to the arbitration rules in the California Arbitration Act ("CAA"). *Id.* at 470-71. The question before the Court was whether the FAA preempts the CAA and requires that, in disputes subject to the FAA, federal rules of arbitration apply. *Id.* at 470-73. The Court noted that the FAA preempts state laws that render arbitration agreements entirely unenforceable. *Id.* at 472, 478 (citing *Southland Corp. v. Keating*, 464 U.S. 1, 10 (1984)); *see also Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (FAA preempts state law conditioning enforceability of arbitration clause on compliance with special notice requirements applicable only to arbitration provisions). It held, however, that the FAA does not mandate certain rules of arbitration. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt*, 489 U.S. at 476. Titan argues that just as federal law will enforce an agreement to arbitrate pursuant to non-federal rules of arbitration, federal law should enforce an agreement to determine arbitrability based on non-federal arbitrability law.

**[3]** We agree with Titan that, based on *Volt*, contracting parties have the power to agree to apply non-federal arbitrability law. The Court stated in *Mitsubishi* that courts should determine arbitrability "by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Mitsubishi*, 473 U.S. at 626 (citation and internal quotation marks omitted). But neither party in *Mitsubishi* argued that anything other than federal arbitrability law applied to the dispute. Thus, although *Mitsubishi* states that federal arbitrability law applies to disputes under the FAA, it does not address whether federal arbitrability law allows the parties to agree to a non-federal arbitrability law. *Volt*'s statement that the federal policy is "to

ensure the enforceability, according to their terms, of private agreements to arbitrate," 489 U.S. at 476, strongly suggests that courts should respect contracting parties' agreement to be governed by non-federal arbitrability law.

Our conclusion is consistent with decisions of our sister circuits. Largely for the reasons just discussed, the Fifth Circuit held that contracting parties could agree to apply Texas arbitrability law in a case governed by the FAA. *Ford v. NYL-Care Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 248-49 (5th Cir. 1998). Several other circuits have applied non-federal arbitrability law in cases governed by the FAA with less detailed discussion. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50-51 (2d Cir. 2004) (applying Swiss arbitrability law); *In re Oil Spill By the "Amoco Cadiz" Off the Coast of France March 16, 1978*, 659 F.2d 789, 793 (7th Cir. 1981) (applying English arbitrability law).

**[4]** We therefore hold that courts should enforce contracting parties' agreement to have arbitrability governed by non-federal arbitrability law.

## 2.    Parties' Choice of Arbitrability Law

**[5]** The more difficult question is how courts should decide whether the parties have agreed to apply non-federal arbitrability law. The general rule in interpreting arbitration agreements is that courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The general rule "would require the court to see whether the parties objectively revealed an intent to" apply non-federal arbitrability law. *Id.* If we were to apply the general rule in this case, it may well be that English law would apply to determine arbitrability.

**[6]** There are, however, some situations concerning the determination of arbitrability in which courts require a higher

showing of intent. In *Kaplan*, the Supreme Court held that courts should be cautious in determining whether the parties have agreed to arbitrate arbitrability. The Court held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944 (citation, internal quotation marks and alterations omitted). Under *Kaplan*, the usual presumption that exists in favor of the arbitrability of merits-based disputes is replaced by a presumption *against* the arbitrability of arbitrability. *Id.* The Court reasoned that the question of whether a given merits-based dispute is arbitrable

> arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter. On the other hand, the [question of] "who (primarily) should decide arbitrability" . . . is rather arcane. A party often might not focus upon that question. . . . And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*Id.* at 945 (internal citations omitted).

Courts have taken different approaches to the question of how to determine whether the parties have agreed to apply non-federal arbitrability law. The Fifth Circuit in *Ford*

appears to have applied standard contractual analysis in concluding that Texas arbitrability law applied. It held that the combination of a clause providing that any claim must be settled "in accordance with the Texas General Arbitration Act"; a bold-typed, all-caps, underlined statement on the first page of the agreement reading, "Notice: This Agreement is subject to arbitration under the Texas Arbitration Act"; and the fact that the agreement's drafters opposed arbitration all demonstrated that "the parties intended Texas law . . . to govern the scope of the arbitration clause." *Ford*, 141 F.3d at 246, 249.

The Third Circuit, on the other hand, has held that a general choice-of-law provision is not enough to displace federal arbitrability law. *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 & n.8 (3d Cir. 1978). Several district courts have taken the same approach as the Third Circuit. In *Chloe Z Fishing Co.*, 109 F. Supp. 2d at 1252-54, the district court concluded that a general choice-of-law provision is insufficient to overcome the "overriding basis" the FAA creates for applying federal arbitrability law. In *Sea Bowld Marine Group, LDC v. Oceanfast Pty., Ltd.*, 432 F. Supp. 2d 1305, 1311-12 (S.D. Fla. 2006), the district court held that a general choice-of-law provision was ambiguous concerning whether the parties specified the relevant arbitrability law. It reasoned that "the Agreement here contains choice-of-law and arbitration provisions that both reference foreign law. While these designations are relevant to the substantive law to be used, and the location of arbitration, they say nothing, and mean nothing, as to the threshold issue of arbitrability." *Id.* at 1312. The district court in this case generally followed the reasoning in *Sea Bowld. See Cape Flattery*, 607 F. Supp. 2d at 1185.

In concluding that a general choice-of-law provision does not constitute an agreement to apply non-federal arbitrability law, none of these cases specifically relied on *Kaplan*. However, just as *Kaplan* was concerned about interpreting a general arbitration agreement to constitute an agreement to

arbitrate arbitrability, these courts were concerned about interpreting a general choice-of-law provision to constitute an agreement to apply non-federal arbitrability law. We share these concerns and conclude that our approach to this question should be guided by *Kaplan*.

**[7]** Like the question of who should decide arbitrability, the question of what law governs arbitrability is "rather arcane." In negotiating an agreement, parties are just as unlikely to give thought to the applicable arbitrability law as they are to give thought to the person determining arbitrability. Thus, if courts were to interpret silence or ambiguity concerning the applicable arbitrability law as providing for a non-federal arbitrability law, parties could be subjected to a foreign arbitrability law when they reasonably thought that federal arbitrability law would apply. We therefore conclude, following *Kaplan*, that courts should apply federal arbitrability law absent "clear and unmistakable evidence" that the parties agreed to apply non-federal arbitrability law. *Kaplan*, 514 U.S. at 944 (citation, quotation marks, and alterations omitted).

**[8]** In this case, there is no clear and unmistakable evidence that the parties agreed to apply English arbitrability law. The arbitration provision states that "[a]ny dispute arising under this Agreement shall be settled by arbitration in London, England, in accordance with the English Arbitration Act 1996 and any amendments thereto, English law and practice to apply." Under this provision, English arbitration law clearly applies to disputes that are subject to arbitration, and English law and practice are to be applied by the arbitrator. *See Cape Flattery*, 607 F. Supp. 2d at 1185. However, the agreement is ambiguous concerning whether English law also applies to determine whether a given dispute is arbitrable in the first place. Faced with such ambiguity, we conclude that federal law applies to determine arbitrability.

## B.    Federal Arbitrability Law

Applying federal arbitrability law, we conclude that this case is not arbitrable. The Agreement provides for arbitration of "[a]ny dispute arising under this Agreement." Our interpretation of the phrase "arising under" is controlled by our prior decisions in *Mediterranean* and *Tracer*. In both of those cases, we held that the phrase "arising under" in an arbitration agreement should be interpreted narrowly. We first discuss the applicability of *Mediterranean* and *Tracer* to this case, and then discuss their actual application.

### 1.    Applicability of *Mediterranean* and *Tracer*

**[9]** *Mediterranean* involved a construction contract providing that "[a]ny disputes arising hereunder" would be settled through binding arbitration. *Mediterranean*, 708 F.2d at 1461. One of the parties to the contract sued, claiming breach of contract, breach of fiduciary duty, conspiring to induce breach of contract, quantum meruit, and conversion. *Id.* The defendant moved to compel arbitration. One of the issues in the case was whether the language "arising hereunder" was meant to cover "any disputes between the parties," or only disputes "arising under the contract itself and . . . not . . . matters or claims independent of the contract or collateral thereto." *Id.* at 1463 (internal quotation marks omitted). We noted that the Second Circuit, in *In re Kinoshita & Co.*, 287 F.2d 951 (2d Cir. 1961), had narrowly construed the language "arising under" and "arising out of." *Mediterranean*, 708 F.2d at 1463. We interpreted "arising hereunder" as "synonymous with 'arising under the Agreement.' " *Id.* at 1464. We agreed with the Second Circuit that when parties intend to include a broad arbitration provision, they provide for arbitration "arising out of or relating to" the agreement. *Id.* Because of the absence of the "relating to" language in the arbitration provision, we had "no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of disputes, *i.e.*, only those

relating to the interpretation and performance of the contract itself." *Id.*

*Tracer* involved a licensing agreement providing that "[i]n the event any controversy or claim arising out of this Agreement cannot be settled by the parties [ ], such controversy or claim shall be settled by arbitration." *Tracer*, 42 F.3d at 1295 (alterations in original). The case involved, among other things, a tort claim for misappropriation of trade secrets based on defendants' continued use of trade secrets for which they no longer had a license. *Id.* at 1294-95. We noted that *Mediterranean* "narrowly circumscribes the interpretation to be given [the arbitration] clause." *Id.* at 1295. We thus concluded that because the tort claim constituted an "independent wrong from any breach of the licensing and nondisclosure agreements[,] . . . . it does not require interpretation of the contract and is not arbitrable under *Mediterranean Enterprises*." *Id.* We also rejected the defendants' argument that the dispute was arbitrable because it would not have arisen but for the contract. "The fact that the tort claim would not have arisen 'but for' the parties' licensing agreement is not determinative." *Id.*

The language discussed in these cases — "arising hereunder," "arising under," and "arising out of" — is the same as that at issue in this case. The Agreement between Cape Flattery and Titan provides that "[a]ny dispute arising under this Agreement" shall be subject to arbitration. Titan argues that, notwithstanding the fact that the language in this case is the same as that in *Mediterranean* and *Tracer*, we should interpret "arising under" broadly. Titan argues that we should not follow *Mediterranean* and *Tracer* because those cases were decided before the Supreme Court's more recent decisions emphasizing the strength of the presumption in favor of arbitration.

Titan is certainly correct that there is a presumption in favor of arbitrating the merits of a dispute. "[A]ny doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25 (footnote omitted). Courts should thus "construe ambiguities concerning the scope of arbitrability in favor of arbitration." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 66 (1995). However, this presumption was established well before our decision in *Mediterranean*. Indeed, in *Mediterranean* we wrote that "federal policy favors the enforcement of arbitration agreements," 708 F.2d at 1463, and in Tracer we noted the "federal policy favoring [arbitration]," 42 F.3d at 1294. A purportedly new federal policy in favor of arbitration therefore cannot be a basis for concluding that these decisions are no longer valid.

Titan notes that other circuits have relied on the federal policy favoring arbitration to construe broadly language that is similar to the language in this case, disagreeing with our decisions in *Mediterranean* and *Tracer*, and with the Second Circuit's decision in *Kinoshita*. *See Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.,* 350 F.3d 568, 577-78 (6th Cir. 2003); *Battaglia v. McKendry*, 233 F.3d 720, 724-28 (3d Cir. 2000); *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 383-86 (11th Cir. 1996); *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813 (4th Cir. 1989). Although Titan is correct that these circuits have disagreed with our reasoning in *Mediterranean* and *Tracer*, out-of-circuit cases provide no basis for us to ignore our own precedent.

Titan also notes that both our court and the Second Circuit have significantly limited the application of *Mediterranean, Tracer*, and *Kinoshita*. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-21 (9th Cir. 1999) (broadly interpreting the phrase "arising in connection with" in an arbitration agreement); *Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 26 (2d Cir. 2002) (limiting application

of *Kinoshita* to the precise language at issue in that case). However, it is one thing to limit the application of these cases to the specific language at issue. It is quite another to simply refuse to follow them.

There is a good reason to indicate clearly to contracting parties what specific language will signify that the scope of their arbitration agreement is narrow. Once they know the specific language that is required, they can rely on that language to produce a result they jointly desire. The Second Circuit relied on this rationale in declining to overturn *Kinoshita*, reasoning that "contracting parties may have (in theory at least) relied on [*Kinoshita*] in their formulation of an arbitration provision." *S.A. Mineracao Da Trindade-Samitri v. Utah Intern., Inc.*, 745 F.2d 190, 194 (2d Cir. 1984). Similarly, in this case, when Titan and Cape Flattery entered into the Agreement, *Mediterranean* and *Tracer* had both been decided. The Agreement concerned the salvage of a vessel that had run aground in the Ninth Circuit. There is no reason to believe that the experienced lawyers representing both parties intended that the language they chose would be interpreted differently than it had been in those cases.

We conclude that because the language in the arbitration provisions in *Mediterranean* and *Tracer* is the same as the language in the Agreement, the narrow interpretation of "arising under" in those cases controls.

### 2.    Application of *Mediterranean* and *Tracer*

Applying *Mediterranean* and *Tracer*, we have no difficulty concluding that the present dispute is not arbitrable. The dispute in this case is based on the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*. Once the M/V Cape Flattery ran aground, Cape Flattery was responsible for "removal costs and damages" under 33 U.S.C. § 2702. Cape Flattery was also liable for all damage to natural resources resulting from the grounding. *Id.* §§ 2701(32)(A), 2702(a), 2702(b)(2)(A). Cape

Flattery could "bring a civil action for contribution against any other person who is liable or potentially liable" for the damage "under this Act or another law" under § 2709. Because Titan was a party rendering "care, assistance, or advice" in removing the vessel, Cape Flattery can hold Titan contributorily liable if Titan was "grossly negligent." *Id.* § 1321(c)(4). Cape Flattery alleged in its complaint that Titan was grossly negligent, in violation of both Hawaii and general maritime law, in deciding to use submerged, rather than floating, tow lines, and that the submerged lines caused damage to the coral reef.

**[10]** *Mediterranean* established that under an arbitration agreement covering disputes "arising under" the agreement, only those disputes "relating to the interpretation and performance of the contract itself" are arbitrable. *Mediterranean*, 708 F.2d at 1464. *Tracer* similarly held that when a tort claim constitutes an "independent wrong from any breach" of the contract it "does not require interpretation of the contract and is not arbitrable." *Tracer*, 42 F.3d at 1295. *Tracer* further clarified that a tort claim is not arbitrable just because it would not have arisen "but for" the parties' agreement. *Id.*

**[11]** The present dispute does not turn on an interpretation of any clause in the contract. As the district court noted, "[t]he parties point to no Agreement provision that Defendant allegedly breached — the Agreement is silent regarding what tow lines Defendant must use, how precisely Defendant must salve the Vessel, and whether Defendant must take precautions to prevent harm to the coral reef." *Cape Flattery*, 607 F. Supp. 2d at 1190 (footnote omitted). Nor does the dispute turn on Titan's performance under the contract. Instead the dispute involves a tort claim based on Hawaii and maritime tort law, incorporated as part of the Oil Pollution Act of 1990, and limited by that federal statute to grossly negligent acts.

**[12]** We therefore conclude that under the narrow interpretation of "arising under" in *Mediterranean* and *Tracer*, the present dispute is not arbitrable.

Conclusion

Based on the Supreme Court's reasoning in *Kaplan*, we conclude that courts should apply non-federal arbitrability law only if there is clear and unmistakable evidence that the parties intended to apply such non-federal law. Because there is no clear and unmistakable evidence in this case, federal arbitrability law applies. Under federal arbitrability law, our decisions in *Mediterranean* and *Tracer* mandate a narrow interpretation of a clause providing for arbitration of all disputes "arising under" an agreement. Under this narrow interpretation, the present dispute is not arbitrable. We therefore affirm the district court's careful and thorough opinion.

**AFFIRMED.**