**SEA BOWLD MARINE GROUP, LDC, a Cayman Islands Company, Plaintiff,**

v.

**OCEANFAST PTY, LTD, an Australian corporation, Oceanfast LLC, a Florida limited liability company, Austal Ltd., an Australian corporation, and Austal Ships Pty, Ltd., an Australian corporation, Defendants.**

No. 05–61881 CIV.

United States District Court, S.D. Florida.

May 5, 2006.

John Keller, Esq., Terrence Russell, Esq. and Sundeep Mullick, Esq., Ft. Lauderdale, FL, for Plaintiffs.

Howard Camerik, Esq., Steven Lessne, Esq. and Kevin P. Mason, Esq., Boca Raton, FL, for Defendants.

### ORDER ON PLAINTIFF'S MOTION FOR REMAND AND DEFENDANTS' MOTION TO COMPEL ARBITRATION

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Compel Arbitration Pursuant to 9 U.S.C. § 206, and Memorandum of Law ("Motion to Compel") [**DE 2, filed December 9, 2005**] and Plaintiff's Motion for Remand [**DE 6, filed January 9, 2006**]. On January 17, 2006, Plaintiff responded to Defendants' Motion to Compel [**DE 9**]. On February 7, 2006, Defendants filed a Combined Memorandum of Law—Response in Opposition to Motion for Remand and Reply in Support of Motion to Compel Arbitration [**DE 17**]. On February 23, 2006, Plaintiff filed a Memorandum in Reply to Defendants' Opposition to Motion for Remand and in Response to Defendants' Combined Memorandum of Law [**DE 19**]. On April 4, 2006, I held oral argument on the countervailing motions, and it became clear that further briefing of an issue was necessary. Therefore, on April 19, 2006, Defendants filed a Memorandum of Law on Threshold Choice–of–Law Issue [**DE 28**], and Plaintiff filed a Memorandum of Law on Choice of Law [**DE 29**].

### I. Factual and Procedural Background

This case involves the alleged poor construction of a luxury yacht. Plaintiff, Sea Bowld Marine Group, LDC ("Sea Bowld") entered into negotiations to construct a luxury yacht with Oceanfast LLC ("Oceanfast USA"). (Amend. Compl. at ¶ 3).[1]

---

1. Oceanfast USA, which was a Florida limited liability company, filed articles of dissolution

On November 24, 2000, Sea Bowld entered into a Shipbuilding Contract (the "Agreement") with Defendant Oceanfast PTY, Ltd. ("Oceanfast") for the construction of a 49.95 meter Motor Yacht (the "Vessel") (Amend. Compl. at ¶ 19). Oceanfast is in the business of designing and constructing high-quality, large, custom oceangoing yachts. (*Id.* at ¶ 6). The Agreement is signed by Richard Scott Williams, who Sea Bowld contends is an officer of Oceanfast USA. (*Id.* at ¶ 3; Agreement, p. 54). Defendant Austal Ltd. ("Austal") signed a "Deed of Guarantee" by which it guaranteed Sea Bowld's obligations under the Agreement. (*Id.* at ¶ 4). Austal wholly owns Oceanfast and Austal Ships Pty, Ltd. ("Austal Ships"). (*Id.*). Austal Ships serves as the service arm for the "Austal Group," a moniker Austal uses to refer to certain of its subsidiaries, including Oceanfast, Austal Ships, and others. (*Id.* at ¶¶ 4 and 5).

On May 7, 2004, Oceanfast assigned its "rights and obligations in, under and to the warranty of quality and guaranty of this luxury motor yacht" to Austal Ships. (*Id.* at ¶ 21). Sea Bowld consented to the assignment of Oceanfast's rights to Austal Ships. (*Id.*).

Sea Bowld alleges that Oceanfast failed to properly construct the Vessel, and that Defendants are financially responsible for the extensive repairs required to make the Vessel seaworthy. (*Id.* at ¶¶ 44 through 93). The alleged damages to the Vessel are significant. According to Sea Bowld, the Vessel is covered in heavy black soot, resulting from an defectively installed diesel generator (*id.* at ¶ 47); its computer control system is impossible to operate (*id.* at ¶ 57); there are numerous leaks in the hydraulic system (*id.* at ¶ 59) and the spa (*id.* at ¶ 60); the anchor strike plates were defectively installed and ultimately separated from the Vessel during a trip at sea on June 29, 2004.

(*id.* at ¶ 61); the exterior paint was improperly applied leading to a poor aesthetic appearance (*id.* at ¶ 63); there are numerous structural cracks in the Vessel (*id.* at ¶ 66); the main exhaust system was defectively designed (*id.* at ¶ 67); the cabinet hardware was not properly affixed (*id.* at ¶ 68); undersized hydraulic lines for the bow thruster assemblies were installed (*id.* at ¶ 69); and a drain was installed on an upper deck that allowed overflow water to enter the Vessel's living quarters (*id.* at ¶ 73). Sea Bowld points out that these are just some of the defects in the Vessel's construction. (*Id.* at ¶ 89).

On July 22, 2005, Sea Bowld filed a fourteen-count Complaint against Defendants in a Florida state court. On or around October 3, 2005, Sea Bowld amended the Complaint. Sea Bowld now asserts eighteen counts against Defendants: breach of express warranty against Austal Ships and Austal (Counts I and II); breach of contract against Oceanfast and Austal (Counts III and IV); violation of Florida Deceptive and Unfair Trade Practices Act against Oceanfast USA (Count V); breach of implied warranty against Oceanfast and Austal (Counts VI, VII, VIII, IX, X, and XI); violation of Australia's Trade Practices Act against Oceanfast, Austal Ships, and Austal (Counts XII, XIII, XIV, XV, and XVI); specific performance against Austal Ships and Austal (Count XVII); and breach of confidentiality agreement against Oceanfast and Austal (Count XVIII).

On December 9, 2005, Defendants removed the Amended Complaint to this Court pursuant to 9 U.S.C. § 205, the portion of the Federal Arbitration Act ("FAA") governing disputes involving an arbitration agreement arising under the Convention on Recognition and Enforcement of Foreign Arbitral Awards of June

10, 1958 (the "Convention"). Contemporaneously, Defendants filed the Motion to Compel, which seeks transfer of this case to arbitration in Australia pursuant to the following language in the Agreement:

> [i]f at any time any dispute whatsoever shall arise between the Purchaser and the Builder before or during construction or after the delivery of the Vessel, under or in relation to or in connection with this Agreement or the interpretation thereof or arising in or out of or in connection with performance of or the carrying out of any of the work under this Agreement it shall, unless otherwise specifically provided for in this Agreement, be referred to arbitration in Western Australia in accordance with the laws relating to arbitration in force in Western Australia and any such arbitration award shall be final and binding upon the parties hereto.

(the "Arbitration Clause") (Agreement, § 26.1). Additionally, the foreign Defendants seek dismissal of the Complaint on grounds of personal jurisdiction, and all Defendants seek dismissal for reasons of *forum non conveniens.*

Sea Bowld's Motion for Remand posits that the Arbitration Clause is unenforceable, and remand to state court must follow since Defendants state no grounds for subject matter jurisdiction apart from that bestowed on the Court by the FAA. The centerpiece of Sea Bowld's argument on enforceability is that three of the named Defendants did not sign the Agreement, and therefore cannot compel arbitration. Sea Bowld urges this Court in determining the scope of the Arbitration Clause to apply Australian law which, it argues, would disallow arbitration of this dispute. To that end, Sea Bowld directs this Court to another portion of the Agreement, its choice-of-law clause, which reads as follows:

> [t]his Agreement shall be governed by and construed in accordance with the applicable laws of the State of Western Australia and the Commonwealth of Australia and all the parties hereto agree to submit to the courts of Western Australia and the Commonwealth of Australia having jurisdiction.

(Agreement, § 25). Australian law, Sea Bowld argues, does not feature as liberal a posture towards arbitration as does American law, and it would not support arbitration in this case.

After reviewing the parties' briefs and considering their presentations at oral argument, I grant Defendants' Motion to Compel and I deny Sea Bowld's Motion for Remand.

## II. Jurisdiction

Federal courts have jurisdiction over actions arising under the Convention. 9 U.S.C. § 203.[2] 9 U.S.C. § 202. Arbitration agreements that arise out of a "legal relationship, whether contractual or not, which are considered as commercial," and which involve at least one foreign citizen (unless circumstances that are not relevant to these proceedings exist) fall under the Convention. *Id.* This case surrounds a commercial agreement involving a foreign entity that is a signatory to the Conven-

---

**2.** The FAA, of which § 203 is a part, implements the United States' adoption of the Convention. *General Elec. Co. v. Deutz AG,* 270 F.3d 144, 154 (3d Cir.2001). I should point out that cases arising under the Convention are exempt from the typical rule that the FAA does not, on its own, confer subject matter jurisdiction on the district court. *Baltin v. Alaron Trading Corp.,* 128 F.3d 1466, 1469 (11th Cir.1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998) (courts have long held that "the FAA does not confer subject matter jurisdiction on federal courts."). Section 205 expressly provides that a defendant in a state court case involving an arbitration agreement arising under the Convention may remove that case to the corresponding district court.

tion.[3] As such, this Court has federal subject matter jurisdiction and may proceed to the issues raised in the parties' motions.

### III. Choice of Law

■ At my direction, the parties filed supplemental memoranda of law regarding whether I should apply American law or Australian law in evaluating the scope of the Arbitration Clause. Once I resolve this dispute, I will apply the governing law to my analysis of whether this case falls within the Arbitration Clause.

As noted above, this Court's jurisdiction extends from a specific portion of the FAA governing international arbitration agreements. A number of fundamental principles that derive from the larger body of FAA jurisprudence will help me analyze the parties' respective positions. I begin by acknowledging the celebrated liberal policy favoring arbitration agreements. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). Congress enacted the FAA to reverse years of hostility to arbitration agreements, and to "place arbitration agreements upon the same footing as other contracts." *Id.* This presumption in favor of arbitration is especially forceful in cases involving international agreements. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985); *Bautista v. Star Cruises*, 396 F.3d 1289, 1295 (11th Cir.2005), cert. dismissed, —— U.S. ——, 125 S.Ct. 2954, 162 L.Ed.2d 884 (2005). Nevertheless, despite the clear favoritism shown arbitration, it is equally clear that a court will not force arbitration where it is not wanted. *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1419 (11th Cir.1990) ("parties will not be required to arbitrate when they have not agreed to do

so."). Arbitration agreements must be enforced according to their terms. *Volt Info. Scis. Inc. v. Bd. of Trs.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989).

The Agreement contains a choice-of-law clause indicating Australian law, as well as a mandate that disputes be resolved in arbitration in Australia. Sea Bowld contends that the only way to enforce the Agreement according to its terms, which is what the FAA requires, is to interpret the scope of the Arbitration Clause under Australian law. Defendants counter that while those clauses dictate the substantive law that an arbitrator must apply to any disputes arising between the parties, they do not require this Court to apply Australian law in evaluating whether this particular dispute falls within the umbrella of the Arbitration Clause. They urge that the arbitrability analysis may proceed only under American federal law.

Interestingly, both parties rely upon divergent interpretations of two Supreme Court cases. The first, *Volt*, required the Supreme Court to determine issues of preemption involving the FAA. The parties in *Volt* conducted business pursuant to a construction contract that required arbitration in California. *Id.* at 470–71, 109 S.Ct. 1248. The defendant demanded arbitration, and the plaintiff filed suit in a California state court. *Id.* at 471, 109 S.Ct. 1248. The defendant moved to compel arbitration in the state court lawsuit. *Id.* The California state court denied the motion to compel and stayed arbitration pending resolution of the litigation pursuant to a specific California law authorizing such stays. *Id.* The California appellate court affirmed, ruling that the parties' designation of California law effectively incorporated Califor-

---

**3.** The United States and Australia have both adopted the Convention. 9 U.S.C. § 201, Historical and Statutory Notes.

nia's rules of arbitration into their agreement. *Id.*

One of the issues the Court addressed was whether the California appellate court's ruling violated "the settled federal rule that questions of arbitrability in contracts subject to the FAA must be resolved with a healthy regard for the federal policy favoring arbitration."[4] *Id.* at 475, 109 S.Ct. 1248. The Court found that the appellate court's ruling did not offend this provision, but that instead:

> the federal policy is to simply ensure the enforceability, according to their terms, of private agreements to arbitrate. Interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration—rules which are manifestly designed to encourage resort to the arbitral process—simply does not offend the rule of liberal construction set forth in *Moses H. Cone,* nor does it offend any other policy embodied in the FAA.

*Id.* at 476, 109 S.Ct. 1248. Finally, the Court addressed the argument that the FAA, which does not contain a provision authorizing stays, preempts the state court rule that does. *Id.* at 476–77, 109 S.Ct. 1248. The Court concluded that although the FAA preempts state laws that outlaw arbitration generally, it does not prevent parties from agreeing to arbitrate according to a different set of rules:

> [w]here, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed

where the Act would otherwise permit it to go forward.

*Id.* at 479–80, 109 S.Ct. 1248.

The other case cited by the parties is *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The plaintiffs in *Mastrobuono* had a management account with the defendant. *Id.* at 54, 115 S.Ct. 1212. After a dispute arose between the parties, the plaintiffs sued the defendant for mishandling their account. *Id.* The agreement governing the parties' relationship included a clause requiring arbitration under the rules of the NASD, and a separate clause providing New York choice-of-law. *Id.* The district court granted the defendant's motion to stay the court proceedings and to compel arbitration before the NASD. *Id.* While in arbitration, the defendant argued that the arbitrator had no authority to award punitive damages. *Id.* Nevertheless, the arbitrator's ultimate award contained an amount for punitive damages. *Id.* Thereafter, the defendant moved the district court to vacate the punitive damages portion of the arbitration award because New York law, identified by the choice-of-law clause, prohibited arbitrators from making such awards. *Id.* at 54–55, 115 S.Ct. 1212.

On appeal, the defendant argued that under *Volt,* "parties to a contract may lawfully agree to limit the issues to be arbitrated by waiving any claim for punitive damages." *Id.* at 58, 115 S.Ct. 1212. The Court disagreed, specifically rejecting the defendant's suggested reconciliation of the two clauses as requiring " 'New York law relating to arbitration.' " *Id.* at 62,

---

4. Appellant also argued that the state law deprived it of its right under federal law to compel arbitration. *Id.* at 474, 109 S.Ct. 1248. It was the Supreme Court's view that this position misconceived "the nature of the rights created by the FAA." *Id.* The relevant portion of the FAA does not confer "a right to compel arbitration of any dispute at any time" according to the Court. *Id.* Instead, the FAA merely confers the "right to obtain an order directing that arbitration proceed *in the manner provided for in [the parties'] agreement.*" *Id.* at 475 (quoting 9 U.S.C. § 4) (emphasis in original).

115 S.Ct. 1212. "At most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." *Id.* Consonant with the prevailing law on the subject, the Court construed the ambiguity in favor of arbitration. *Id.* Summarizing its analysis, the Court opined that:

the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.

*Id.* at 64, 115 S.Ct. 1212.

Sea Bowld argues that *Volt* and *Mastrobuono* require me to apply Australian law to ascertain whether the Arbitration Clause covers this dispute in order to effect the express intent of the parties. Defendants challenge the applicability of *Volt* and *Mastrobuono* to this case because neither addresses the threshold issue of arbitrability presented to me. Taken together, I conclude that *Volt* and *Mastrobuono* merely require a court to enforce the terms of a parties' agreement to arbitrate, so long as those terms are not ambiguous. I agree with Defendants that the actual holdings in both cases, however, have little to do with the primary issue I have been asked to consider: whether the parties' chosen foreign law governs my analysis of the arbitrability of a particular dispute.

Although its central holding is not pertinent to the instant case, *Mastrobuono* is helpful in other regards. For example, *Mastrobuono* points out that parties are free to specify that something other than the FAA governs a discrete issue. However, when the parties fail to contract out

the FAA on a particular topic, there is no need to read language into the agreement, and a return to the default of federal law for interpretive assignments is appropriate. *Mastrobuono,* 514 U.S. at 60, 115 S.Ct. 1212 (the choice-of-law provision "is not, in itself, an unequivocal exclusion of punitive damages claims"); *see also Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287, 293 (3d Cir.2001) (parties may specifically identify rules of arbitration that are different from that provided for by the FAA), cert. denied, 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 423 (2001).

Applying that concept to this case, I notice that the parties failed to specify the law that governs the arbitrability of claims. Indeed, the Agreement itself is silent on the law governing arbitrability, and this silence is critical.

In a case strikingly similar to this one, United States District Court Judge Adalberto Jordan adopted Defendants' approach. *Olsher Metals Corp. v. Brett Olsher, et al.,* Case No. 01–3212–CIV–JORDAN. The parties in *Olsher* had entered into a distribution agreement whereby the plaintiff distributed the defendant's steel products. *Olsher,* Order Granting Motion to Dismiss in Favor of Arbitration ("Olsher Order"), at pp. 1–2. Their agreement featured an arbitration provision that said that, " 'all disputes related in any way to the interpretation and performance of the foregoing provisions' shall be submitted to binding arbitration in Italy," and it also included an Italian choice-of-law provision. *Id.* at pp. 2–3. A dispute arose between the parties, and eventually the distributor sued the manufacturer, among others, for a violation of RICO, unfair competition, tortious interference, breach of warranty, and breach of contract. *Id.* at p. 3. The defendants moved to compel arbitration.

The plaintiff argued that its claims were not subject to arbitration in Italy because the arbitration clause was not mandatory under Italian law, and because Italian law does not authorize arbitration of tort and conspiracy claims, two of the plaintiff's causes of action. *Id.* at p. 4. Judge Jordan considered and rejected the plaintiff's argument that the parties' agreement evinced a clear intent that Italian law govern the scope of the arbitration clause. *Id.* at p. 5. Judge Jordan found instead that federal law controlled not only determinations as to the validity and enforceability of the arbitration clause, but also the interpretation and scope of the clause. *Id.* He quoted *Mitsubishi Motors* for the proposition that whenever a court attempts to ascertain whether the parties intended to arbitrate a particular dispute, it must apply federal law. *Id.* at p. 6.

On December 15, 2003, the Eleventh Circuit affirmed Judge Jordan's ruling, *per curiam,* in an unpublished opinion ("Unpublished Opinion"). Although I recognize that the Eleventh Circuit's opinion is only persuasive authority, given the similarities between the *Olsher* case and this one, I give it due consideration. *U.S. v. Rodriguez–Lopez,* 363 F.3d 1134, 1138 n. 8 (11th Cir.2004) ("[w]hile unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority.").

The Eleventh Circuit paraphrased the issue presented as this: "whether the parties' express choice of law—Italian— governs the procedural question of arbitrability or is application of the chosen law limited to substantive issues." Unpublished Opinion, p. 6. After returning to the plaintiff's reliance on *Volt,* the Eleventh Circuit found, like Judge Jordan did, that the Supreme Court clarified *Volt* in its later-released opinion, *Mastrobuono. Id.* at p. 7. "The district court concluded—correctly, we think—that the arbitra-

tion provision was enforceable and swept within its purview all claims asserted by [the plaintiff]." *Id.* at p. 8.

Like the agreement in *Olsher,* the Agreement here contains choice-of-law and arbitration provisions that both reference foreign law. While these designations are relevant to the substantive law to be used, and the location of arbitration, they say nothing, and mean nothing, as to the threshold issue of arbitrability. Federal law controls my interpretation of whether the Arbitration Clause covers the dispute in this case. With the Eleventh Circuit's affirmance of *Olsher* following an analysis of nearly identical facts and applicable law, there is no guessing about how the Eleventh Circuit would decide the issue if confronted with it again.

A number of courts from wide-ranging jurisdictions have also concluded that federal law governs the question of arbitrability regardless of choice-of-law and arbitration clauses referencing foreign law. For example, in *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.,* 109 F.Supp.2d 1236, 1252 (S.D.Cal.2000), the district court ruled that, regarding a dispute arising under the FAA, neither the "choice-of-law provision governing the [insurance] policies or the reference of disputes 'to arbitration in London' in the arbitral clauses themselves subject the scope of the arbitration clause to English law." Only the Convention and its implementing legislation were relevant to whether the parties agreed to arbitrate their dispute. *Id.* English law played no part in the court's analysis of the scope of the arbitration clause; federal law ruled supreme. *Id.* at 1254. *See also Morewitz v. West of England Ship Owners Mut. Prot. & Indem. Ass'n,* 62 F.3d 1356, 1364 (11th Cir.1995) ("federal law comprising generally accepted principles of contract law controls the question of arbitrability"), cert. denied, 516

U.S. 1114, 116 S.Ct. 915, 133 L.Ed.2d 845 (1996); *Westbrook Int'l, LLC v. Westbrook Techs., Inc.,* 17 F.Supp.2d 681, 684 (E.D.Mich.1998) (refusing to infer that foreign law governed the arbitrability of claims merely from the inclusion of a choice-of-law provision dictating foreign law, and stating that "the law of the forum court should apply to determine arbitrability"); *General Elec. Co. v. Deutz,* 270 F.3d 144, 154 (3d Cir.2001) ("[f]ederal law applies to the interpretation of arbitration agreements"); *Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazioni,* 555 F.Supp. 481, 484 (D.Virgin Islands 1982) (acknowledging the Third Circuit's position on which law to apply to questions concerning arbitrability that "[n]either the law of a foreign country, or the law of a particular state (or territory) can ever be chosen—only federal law is controlling"), aff'd 712 F.2d 50 (3d Cir.1983); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk,* 585 F.2d 39, 43 (3d Cir.1978) (federal law governed whether the parties agreed to arbitrate the dispute that was the subject of the litigation). I must apply federal law to determine if this case is subject to arbitration in Australia.

## IV. Arbitrability

■ In arguing that the Arbitration Clause does not pertain to this dispute, Sea Bowld makes five points: first, that Defendants Austal, Austal Ships, and Oceanfast USA did not sign the Arbitration Clause; second, that Australian law governs the interpretation of the Arbitration Clause; third, that equitable estoppel does not apply in this case; fourth, that the Arbitration Clause is invalid, null and void, inoperative or incapable of being performed; and fifth, that the Arbitration Clause does not embrace claims under the Australian Trade Practices Act ("TPA"). I have already addressed the second concern above. Therefore, I will address each of

Sea Bowld's remaining points in succession.

### A. Non–Signatories

Sea Bowld asserts that this dispute is not subject to arbitration because three of the four Defendants did not sign the Agreement. As non-signatories, Sea Bowld challenges these Defendants' efforts to force arbitration in Australia. Defendants respond that they are entitled to arbitrate this dispute with Sea Bowld under the doctrine of equitable estoppel.

The Eleventh Circuit Court of Appeals has repeatedly stated that the "lack of a written arbitration agreement is not an impediment to arbitration." *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757 (11th Cir.1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994) (citing *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co. Inc.,* 741 F.2d 342, 344 (11th Cir.1984)). In fact, the Eleventh Circuit recognizes two instances in which a non-signatory can compel arbitration:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory. When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[ ] out of and relate[ ] directly to the [written] agreement,' and arbitration is appropriate. Second, application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise, the arbitration

proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999) (internal quotations and citations omitted).

The *Sunkist* case also addressed the equitable estoppel exception.[5] Sunkist had an agreement to arbitrate disputes with its licensee, SSD. 10 F.3d at 755. Del Monte later purchased the stock of SSD, placed the "Sunkist" brand in production with its own soft drink brands, and essentially eliminated SSD's separate operating status. *Id.* Sunkist sued Del Monte for interference with its license agreement with SSD,[6] and Del Monte moved to compel arbitration on the grounds that the license agreement between Sunkist and SSD called for arbitration. *Id.* at 755–56. The court granted Del Monte's motion, and the dispute went to arbitration. *Id.* at 756.

On appeal, Sunkist argued that the court should not have decided the arbitrability of its claim with Del Monte because its consent to arbitration was a factual dispute. *Id.* Del Monte argued that Sunkist should be equitably estopped from denying it the right to arbitrate under the license agreement between it and SSD. *Id.* at 756–57. The court opened its analysis with an inquiry into whether the dispute fell "within the scope of the arbitration clause contained in the license agreement." *Id.* at 757–58. To that end, the court considered whether Sunkist's claims against Del Monte for interference had any relationship to the license agreement between it

and SSD. *Id.* at 758. In finding that it did, the court noted that each of Sunkist's claims mentioned the license agreement explicitly. *Id.* And where Sunkist strayed from direct reliance on the license agreement, its existence was always presumed. *Id.* at 758. Since it found that each of Sunkist's claims against Del Monte arose out of or related to the license agreement, the court ruled that Sunkist's disputes with Del Monte were properly submitted to arbitration. *Id.; see also McBro Planning & Dev.,* 741 F.2d at 343–44 (noting that the close relationship between the three parties, including one who was not a signatory to the agreement requiring arbitration, and the alleged wrongs "give[s] one pause," and holding that construction manager could force contractor to send their dispute to arbitration pursuant to the arbitration clause in the contractor's agreement with the owner because the dispute centered on construction manager's alleged failure to perform conditions under that agreement).

The Eleventh Circuit cases place a strong emphasis on the interrelationship between the claims at issue, and the underlying subject matter of the agreement that requires arbitration. Indeed, the equitable estoppel doctrine emphasizes equity and fairness. *Grigson,* 210 F.3d at 528. In this case, there is little doubt that both grounds for equitable estoppel identified in *MS Dealer Service* exist in this case. The non-contractual claims alleged in the Amended Complaint presume the existence of the Agreement because they encompass the same duties and obligations

5. Recently, another circuit court recognized that the Eleventh Circuit "has taken the lead in applying equitable estoppel under the intertwined-claims basis." *Grigson v. Creative Artists Agency,* 210 F.3d 524, 527 (5th Cir.2000), cert. denied, 531 U.S. 1013, 121 S.Ct. 570, 148 L.Ed.2d 488 (2000) (citing *McBro* ).

6. Sunkist's counterclaim included causes of action for tortious interference, trademark infringement, unfair competition, conspiracy to breach contract, conspiracy to breach the covenant of good faith and fair dealing, civil conspiracy, fraudulent misrepresentation, declaratory relief, and abuse of process. 10 F.3d at 758, n. 3.

by the Defendants to Sea Bowld. Each of the three non-signatory Defendants in this case are defending claims that are intimately related with, and dependent upon, terms of the Agreement. Austal is purportedly liable pursuant to the Deed of Guarantee; Austal Ships is Oceanfast's assignee on warranty and guaranty obligations imposed by the Agreement; and Oceanfast USA actually signed the Agreement as Oceanfast's agent, according to the allegations of the Amended Complaint. Indeed, the Agreement can be seen as the center of a wheel from which the non-signatory Defendants' obligations radiate. Indeed, each of Sea Bowld's claims against them "presumes the existence of" the Agreement, and therefore the non-signatory Defendants may insist upon arbitration of the claims to the same extent as Ocean-

fast.[7] Finally, Sea Bowld's allegations in the Amended Complaint blend wrongdoing by Oceanfast, the signatory, with misconduct by the three non-signatory Defendants, establishing the other ground for equitable estoppel identified in *MS Dealer Service.* This is a classic case of a signatory to an agreement resisting arbitration on technical grounds. Under such circumstances, the Eleventh Circuit allows for extension of the Arbitration Clause to the non-signatory Defendants.

**B. There are no Grounds for Repudiating the Theory of Equitable Estoppel**

Sea Bowld encourages this Court to reject the equitable estoppel doctrine as regards Austal and Austal Ships because those entities executed separate documents that do not mention arbitration. To

**7.** The non-signatory Defendants should be allowed to participate in arbitration for other reasons. For example, Sea Bowld alleges in the Amended Complaint that Oceanfast USA executed the Agreement. At oral argument, Sea Bowld's counsel confirmed that he believes Oceanfast USA signed as Oceanfast's agent. Not only does this concession remove Oceanfast USA from the category of a "non-signatory," but there is also case-law from within and beyond this circuit that allows an agent of a signatory to compel arbitration under general principles of agency law. *See e.g., Bolamos v. Globe Airport Sec. Servs., Inc.,* No. 02–21005–CIV–MORENO, 2002 WL 1839210, at *2 (S.D.Fla. May 21, 2002) (recognizing an exception to the general rule that only parties to an arbitration agreement may enforce its terms when the non-signatory is an agent of the signatory); *South Alabama Pigs, LLC v. Farmer Feeders, Inc.* 305 F.Supp.2d 1252, 1264 (M.D.Ala.2004), aff'd 64 Fed.Appx. 743 (11th Cir.2003) (Table); *Arnold v. Arnold Corp.-Printed Communications For Business,* 920 F.2d 1269, 1282 (6th Cir. 1990). Austal signed a Deed of Guarantee, and Austal Ships was assigned Oceanfast's warranty and guaranty obligations to Sea Bowld. Sea Bowld argues that they have no right to arbitrate their dispute because the Deed of Guarantee and assignment do not provide arbitration rights. In the case of the

Deed of Guarantee, Sea Bowld points out that provision is made for jurisdiction in an Australian court. However, I note that the Agreement and Deed of Guarantee cross-reference one another, and the dispute resolution clause directs the parties only to the *nonexclusive* jurisdiction of the Australian courts. Regardless, according to the Amended Complaint, Austal is Oceanfast's parent, and Oceanfast is a signatory. Courts have allowed non-signatory parents to compel arbitration based on agreements reached by their subsidiaries. *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988) ("[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement."). Likewise, by accepting assignment of Oceanfast's warranty and guaranty obligations, Austal Ships stepped into Oceanfast's shoes and is entitled to its rights under the Agreement, including the provision on arbitration. Moreover, the Agreement defines "Builder," which is a party to the Arbitration Clause, to include Oceanfast and "its permitted assigns and successors." This phraseology would obviously encompass Austal Ships, and empowers Austal Ships with the same right to compel arbitration as its assignor.

further its position, Sea Bowld relies on *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,* 269 F.3d 187 (3d Cir.2001). In that case, the Third Circuit affirmed the district court's denial of the defendant's motion to compel arbitration under a theory of equitable estoppel. *Id.* at 202. Crucial to the Third Circuit's analysis, however, was the fact that the defendant, a signatory to the agreement, tried to compel a ***non-signatory*** to arbitrate. In fact, the Third Circuit noted that it had never before employed equitable estoppel to bind a non-signatory to an arbitration clause. *Id.* at 199. In the *DuPont* case, the court concluded that an exception to this rule was not warranted:

> [t]he distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged. The District Court recognized that this was so, holding that the corporate form cannot be discarded and a non-signatory required to arbitrate unless its conduct falls within one of the accepted principles of agency or contract law that permit doing so.

*Id.* at 202.

Sea Bowld adopts a different perspective on the holding in *DuPont.* It points to the following language as indicative of a conscious decision by the court to disallow equitable estoppel where the party seeking to apply it entered into an agreement separate from the one featuring the arbitration clause:

> [o]n the one hand, we must be careful about disregarding the corporate form and treating a non-signatory like a signatory. On the other hand, by alleging, albeit by virtue of a separate oral agreement, that Rhodia Fiber failed to secure loan guarantees, DuPont's claim against

Rhodia Fiber implicates, at least in part, the very Agreement which DuPont repudiates to avoid arbitration. It is, however, that separate oral agreement that saves the day for DuPont because, wholly apart from whether Rhodia Fiber breached the Agreement, what is at the core of this case is the conduct and the statements of appellants' representative in January of 1998.

*Id.* at 201. Sea Bowld draws my attention to the last clause of this paragraph. Sea Bowld's interpretation of it is that the *DuPont* court rejected equitable estoppel because "although the background of the plaintiff's claims against a parent and subsidiary was related to the subsidiary's signed agreement including an arbitration clause, the plaintiff was instead claiming under a separate agreement, with no arbitration clause." (Plaintiff's Memorandum in Opposition to Defendant's Motion to Compel Arbitration, p. 12). Sea Bowld misconstrues the *DuPont* case. While the sentence Sea Bowld identifies is somewhat unclear, I believe the most reasonable interpretation is that, under the facts presented there, the oral agreement mentioned truly was distinct from the agreement that featured an arbitration clause. What was more important to the court in *DuPont,* as evinced by the much greater attention it devoted to the issue, was the fact that the party facing equitable estoppel was not a signatory to the arbitration clause. These are not the facts in this case. The party to be equitably estopped, Sea Bowld, signed the Agreement and specifically agreed to arbitrate disputes "under or in relation to or in connection with" the Agreement or "arising in or out of or in connection with performance" of the Agreement. Moreover, the obligations by the non-signatory Defendants to Sea Bowld wholly relate to the contractual obligations arising under the Agreement. For these reasons, the *DuPont* case does not alter my conclusion that

Sea Bowld should arbitrate this dispute against all Defendants in Australia.

## C. The Arbitration Clause Embraces Claims Under the TPA

Sea Bowld contends that Australian law does not support arbitration of its claims under the TPA. Since I have already determined that Australian law does not govern the arbitrability of Sea Bowld's claims against Defendants, I will not consider this argument further.

 Under American federal law, Sea Bowld's TPA claims against Defendants would be subject to arbitration. As *McBro* instructs, "it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract." 741 F.2d at 344. Arbitration of a tort claim is appropriate if it is 'intimately founded in and intertwined with the underlying contract obligations.' *Id.* at 344 n. 9 (quoting *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 841 n. 9 (7th Cir.1981)). Likewise, in *Sunkist*, the Eleventh Circuit condoned arbitration of certain claims, including claims for unfair competition pursuant to 15 U.S.C. § 1125 and the California Business Code. 10 F.3d at 758 n. 3. This is because each of the claims referred to, and presumed the existence of, the license agreement. *Id.* Specifically, the counterclaim in *Sunkist* alleged that the plaintiff caused its subsidiary to violate terms and provisions of a license agreement between the defendant and the subsidiary. *Id.* Therefore, the court stated that each claim maintained by the defendant "arises out of and relates directly to the license agreement." *Id.*[8]

Turning to the instant case, it is clear that the TPA claims are interrelated and intertwined with the breach of contract claims that Sea Bowld asserts. Into each

of its TPA claims, Sea Bowld incorporates factual allegations concerning the Agreement. The TPA claims themselves, implied warranty of merchantable quality, implied warranty of fitness, misleading and deceptive conduct, and liability for loss to other goods, contemplate Sea Bowld's entitlement to relief against Defendants for the defective condition of the Vessel upon delivery. Defendants' obligations to construct a merchantable vessel stem from the Agreement, and its related documents. Olsher Order, p. 8 ("it is clear that ... the breach of warranty claims asserted solely against [the defendant] are subject to arbitration. Both deal expressly with the parties' duties under the contract."). The TPA claims incorporate the Agreement by reference, and they presume its existence. Those claims are, therefore, subject to arbitration to the same extent as Sea Bowld's contractual claims. *In re Managed Care Litigation*, No. 00–MD–1334, 2003 WL 22410373, at *2 (S.D.Fla. Sept. 15, 2003), aff'd 389 F.3d 1191 (11th Cir. 2004), cert. denied, 544 U.S. 1061, 125 S.Ct. 2523, 161 L.Ed.2d 1111 (2005) ("[i]f Providers' allegations 'touch matters' covered by the relevant arbitration agreements, then those claims must be arbitrated, irrespective of how the allegations are labeled.").

## D. The Arbitration Clause is Enforceable Under the Convention

 A court should compel arbitration of a dispute arising under the Convention when: (1) there is an agreement in writing to arbitrate the dispute; (2) the agreement provides for arbitration in the territory of a signatory to the Convention; (3) the agreement to arbitrate arises out of a commercial legal relationship; and (4) there is a party to the agreement who is not an American citizen. *Bautista*, 286 F.Supp.2d at 1361; *Marubeni Corp. v. Mo-*

8. The language of the Arbitration Clause is as broad as the clause at issue in *Sunkist*.

*bile Bay Wood Chip Ctr,* No. Civ.A. 02–0914–PL, 2003 WL 22466215 at *10 (S.D.Ala. June 16, 2003). Sea Bowld challenged the first element on grounds that three of the four Defendants did not sign the Agreement. However, since I determined that the non-signatory Defendants can arbitrate under the Agreement, I conclude that all four criteria are satisfied. Therefore, I must compel arbitration unless the Arbitration Clause is "null and void, inoperative or incapable of being performed." *Bautista,* 286 F.Supp.2d at 1365 (quoting Article II, section 3 of the Convention).

Non-recognition of an Arbitration Clause under the "null and void" standard is required only when the clause is "subject to internationally recognized defenses such as duress, mistake, fraud or waiver, or when it contravenes fundamental policies of the forum nation." *Id.; Ledee v. Ceramiche Ragno,* 684 F.2d 184, 187 (1st Cir.1982). This exception is narrowly construed. *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 960 (10th Cir.1992), cert. denied, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). Sea Bowld characterizes the Arbitration Clause as null and void for reasons arising under Australian law, all of which I dispensed with when I ruled that Australian law does not apply to the issue of arbitrability. Sea Bowld sets forth no reason under federal law why the Agreement is null and void, and particularly given the demanding nature of the inquiry, I do not find it necessary to speculate as to a reason on its behalf. For all of the foregoing reasons, I refer this case to Western Australia for arbitration consistent with the language of the Arbitration Clause.

## V. Stay Versus Dismissal

■ Sea Bowld takes the position that this Court need not consider whether to stay this case or dismiss it because the Arbitration Clause is unenforceable. Obviously, my determination that this case is subject to arbitration renders Sea Bowld's academic observation moot.

Initially, Defendants proffered practical reasons why I should dismiss this case in conjunction with compelling arbitration in Australia. For example, dismissal would prevent claims from "languishing unnecessarily and indefinitely on the court's docket." *Tennessee Imports, Inc. v. Filippi,* 745 F.Supp. 1314, 1324 (M.D.Tenn.1990).

But as Defendants seem to recognize in their reply, the facts of this case suggest practical reasons why a stay is the more appropriate course of action. I raised a concern at oral argument about the effect of my determination of arbitrability on the eventual arbitration of matters in Australia. I specifically asked counsel for Defendants if he would resist arbitration as a strategic defense tactic once in Australia. Defense counsel conceded, on the record, that his clients would not attempt such an end-run around this Order. He agreed that Defendants would submit, without contest, to arbitration in Australia. Nonetheless, I am concerned that in a jurisdiction halfway around the world, Defendants might be tempted to reverse course. In a separate discussion, Sea Bowld alerted the Court to the fact that one or more of its causes of action are approaching the applicable statute of limitations. Both of these unique circumstances leave me reluctant to dismiss this case. Therefore, I will stay this case pending resolution of the parties' dispute in Australia. *Klay v. All Defendants,* 389 F.3d 1191, 1204 (11th Cir.2004), reh'g and reh'g en banc denied, 127 Fed. Appx. 474 (11th Cir.2005) (Table), cert. denied, 544 U.S. 1061, 125 S.Ct. 2523, 161 L.Ed.2d 1111 (2005) (noting that under the Section 3 of the FAA, a stay must issue as to arbitrable issues).[9]

9. Because I rule in favor of arbitration, I need not consider Defendants' arguments in sup-

## VI. Conclusion

As I stated at the outset, the parties' motions turn on my analysis of the arbitrability of the claims asserted against the Defendants in this case. This analysis required me to consult American federal law, not Australian law as Sea Bowld vehemently maintained. Under federal law, the claims against all Defendants are arbitrable under the well-recognized doctrine of equitable estoppel. Having found a written agreement to arbitrate involving all parties, the Arbitration Clause satisfies all four elements for compelling arbitration under the Convention. Therefore, I refer this case for arbitration in Western Australia.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Defendants' Motion to Compel Arbitration Pursuant to 9 U.S.C. § 206, and Memorandum of Law **[DE 2]** is GRANTED.

2. Plaintiff's Motion for Remand **[DE 6]** is DENIED.

3. The parties shall arbitrate the issues raised in this case in Western Australia pursuant to the terms of the Arbitration Clause. This case is STAYED and ADMINISTRATIVELY CLOSED pending conclusion of the arbitration proceedings in Western Australia.

4. All other pending motions are DENIED AS MOOT.

port of dismissal for reasons of personal jurisdiction and *forum non conveniens.*