FERDINAND ROETHEMEYER *et al., Respondents,* v. J. C. MILTON *et al., Appellants.*[1]

*Richards, Gilbert & Conklin* and *Ian R. MacIver,* for appellants.

*LaBerge, Cheney & Hutcheson,* for respondents.

MILLARD, J.—On June 2, 1930, plaintiffs entered into a written agreement with J. C. Milton for the purchase of a tract of land in Yakima county. The purchase price of the property was sixty-five hundred dollars, of which plaintiff purchasers paid two thousand dollars at time of execution of the contract. The purchasers were obligated to pay five hundred dollars January 2, 1931, one thousand dollars on or prior to January 2, 1932, and three thousand dollars on or before January 2, 1933. The contract, which was prepared by the purchasers' attorney, provided that the purchasers should pay for the water and pay the taxes. The contract

[1]Reported in 33 P. (2d) 99.

further provided for forfeiture of the contract if the purchasers failed to pay interest and other charges.

The purchasers went into possession of the land immediately following the execution of the contract, and gathered the crops on the land in the years 1930, 1931 and 1932. The purchasers paid the five-hundred-dollar installment due January 2, 1931, paid one-half of the taxes for the year 1931 and paid one-half of the irrigation assessments for the year 1930. No other payments were made by the purchasers.

In the spring of 1932, Roethemeyer decided to abandon his contract, and so informed his attorney. Probably motivated by the prospects of a good crop, he relinquished the intention—at least until after he had taken off the crop. Roethemeyer's intention to repudiate his contract was not mentioned to vendor Milton, who was on the land and conversed with Roethemeyer during harvest time in 1932, although the parties discussed the matter of improvement of production by elimination of every other row of trees.

Following his harvesting of the 1932 crop of fruit, Roethemeyer again consulted his attorney, and informed him of his intention to give up the contract. His attorney advised him to remove the spray plant and the pipe lines from the land, although they constituted a part of the land under the contractual provision that any improvements placed upon the property should become a part of the land and remain thereon and therein. After digging up a considerable portion of the pipe line, he discontinued further removal thereof on the advice of the man assisting him that such action might result in trouble for Roethemeyer.

His attorney was then informed by Roethemeyer what had been done. The attorney prepared a quitclaim deed, which was acknowledged by the plaintiffs

November 10, 1932, reconveying the property to Milton "for the consideration of one dollar and other good and valuable consideration." The deed further recites:

"This deed is given to surrender and rescind contract between the parties hereto for the purchase of the above described real estate, dated June 2, 1930."

On the date of its execution, the deed was mailed by the purchasers' attorney to Milton. The letter of transmittal reads as follows:

"Enclosed please find quitclaim deed from Ferdinand Roethemeyer and wife to yourself covering Lots 4, 13 and 25 of Parker Heights Orchard Tracts No. 2, Yakima, Washington."

Upon receipt of the deed, Milton consulted an attorney, who advised him not to record the deed, but to hold it for a time. Milton's attempts to communicate with Roethemeyer were futile. He called on Roethemeyer's attorney, who informed him that Roethemeyer was not on the land, and that he did not know the whereabouts of his client. Milton did not record the deed. He did not exercise any right of possession over the land in question, nor did he and Roethemeyer communicate with each other.

On December 11, 1932, Harold B. Gilbert (not the same attorney first consulted by Milton), who was then acting as Milton's attorney, departed from Yakima and did not return until December 31, 1932. On December 12, 1932, the day following the departure from Yakima of Milton's new attorney, the complaint in this action was filed, and was served on the following day. The attorney returned on Saturday, the last day of the year of 1932. The following day was Sunday. The succeeding day, Monday, January 2, 1933, was a legal holiday. On Tuesday, January 3, 1933, the deed

was, by Milton's attorney, returned by registered mail to Roethemeyer, who refused to accept the letter.

Twice subsequently, the deed was sent by registered mail to Roethemeyer, who each time refused to accept the mail. Roethemeyer admitted that, on advice of his attorney, he rejected the registered letters so that the deed could not be returned to him; that, "Well, I didn't want the place back and I didn't want the deed back."

Four persons, doing business under the firm name of the Triple X Land & Investment Co., Inc., were joined with Milton as parties defendant. The complaint alleged that the plaintiffs were induced to enter into the contract by the false representations of Milton and his agents, the four other defendants, as to the character of the place. Plaintiffs further alleged a mutual rescission of the contract, and prayed for the return of the purchase money, taxes and assessments paid by plaintiff vendees and recovery of the value of the pipe line installed on the property.

Over objection of defendants, the cause was set for trial to a jury. All of the defendants, except Milton, were dismissed from the cause. The court withdrew from consideration of the jury the question of fraud, and submitted to the jury only one issue—whether or not there had been a mutual rescission of the contract. Trial of the cause resulted in a verdict for seven hundred fifty dollars (the alleged value of the pipe line) in favor of the plaintiffs. Defendant Milton's motions for judgment notwithstanding the verdict and, in the alternative, for a new trial were overruled. Plaintiffs' motion for judgment, in the sum of $2,453.72, notwithstanding the verdict, was granted, and judgment in that amount was entered against Milton, who appealed.

A careful examination of the record discloses failure of respondents to prove that they were induced by

false representations of appellant and his agents to enter into the contract to purchase appellant's land. This is not a case of rescission on the ground of fraud. The only question is whether there was a mutual rescission of the contract.

Respondents insist that the retention of the deed by the appellant constituted acceptance of the deed, and bound appellant to fulfill all undertakings expressed in the deed, which recites:

"This deed is given to surrender and rescind contract between the parties hereto for the purchase of the above-described real estate, dated June 2, 1930."

It follows, respondents argue, that the acceptance of the deed was an acceptance of mutual rescission.

The only evidence to sustain the theory of mutual rescission is the mailing of the quitclaim deed to Milton and his retention of the deed, unrecorded, for less than two months before he endeavored to return it to respondents. Other than the deed, there were no communications, oral or written, between respondents and appellant. The appellant never resumed possession of the land in controversy.

It is clear that the respondents, who had defaulted in payment of one installment and other charges, desired release from their contractual obligations. However, they were never frank with their vendor. It is apparent that the stealthy means employed by respondents were intended to effect their release from their contractual obligations, and their further purpose was to compel the appellant to return to respondents what the latter had paid on the purchase price.

The quitclaim deed constituted nothing more than an offer to "surrender and rescind contract between the parties." To that offer appellant made no reply, oral or written; he remained silent. Though he

retained the deed, unrecorded, for a short period of time, appellant never resumed possession of, or exercised dominion over, the land. The retention of the unrecorded deed would not, of itself alone, be sufficient to constitute acceptance of the offer to rescind. He was under no obligation to return the deed. The law did not impose upon him the duty of making any reply to the offer. It was essential to the conversion of the offer into a contract that appellant's acceptance be communicated to the respondents. We are committed to the rule that silence does not constitute an acceptance of an offer to enter into such a contract as that proposed by respondents to appellant.

"The next contention is that there was a rescission of the contract before the fishing season actually began. This contention is founded on a letter written by the respondent to the appellant in which he offers to rescind the contract if the appellant would consent thereto, but to the letter he received no reply, either in writing or otherwise. This did not amount to a rescission of the contract. On the contrary, it was not within the respondent's power to rescind it without the co-operation of the appellant, and since no reply was sent to his offer, he could not do otherwise than treat the contract as still in force, and act accordingly. It would have been a breach of the contract on his part to have acted otherwise." *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381.

See, also, *Koepke Sayles & Co. v. Lustig,* 155 Wash. 70, 283 Pac. 458, where we said:

"The further contention is that notice to the respondent that the owners accepted the offer was not necessary in order to bind him. But the general rule is to the contrary. It was so recognized by us in *Ranahan v. Gibbons,* 23 Wash. 255, 62 Pac. 773, where we quoted from Parsons on Contracts to the following effect:

" ' "It is unquestionably true as a general proposition, that a contract cannot bind the party proposing it, and indeed there is no contract, until the acceptance of the offer by the party receiving it is in some way, actually or constructively, communicated to the party making the offer." '

"In 6 R. C. L. 606, this language is used:

" 'In the case of an offer which requires a reciprocal promise it is clear that mental determination to accept, or even an act done in pursuance thereof, is insufficient to bind the party who makes the offer. To constitute acceptance of such an offer there must be an expression of the intention, by word, sign, or writing communicated or delivered to the person making the offer, or his agent. A mere private act of the person to whom the offer is made does not constitute acceptance. For instance, a mere proposal to sell land does not become a sale until accepted, and notice of acceptance given the proposer. A reciprocal promise is required, the party to whom the offer is made must, if he cannot directly communicate his acceptance, use such an agency therefor as amounts to constructive knowledge to the other party. It is nevertheless essential, to convert such proposal into a valid contract, that such acceptance be communicated to the proposer, . . .'

"So, in 13 C. J. 284, it is said:

" 'Since communication of intention is essential to an agreement, an acceptance, like an offer, must, as a rule, be communicated to the offerer or put in the course of communication by an act. There is a radical distinction in regard to communication between offers which ask that the offeree shall do something and offers which ask that the offeree shall promise something. In offers of the former kind communication of acceptance is ordinarily not required; in offers of the latter kind communication of the acceptance is always essential.'

"It will be observed that the texts cited note a distinction between offers which ask that the offeree shall do something and offers which ask that the offeree shall promise something, stating the rule to be that communication of the acceptance is not required in the one instance, while in the other it is always essen-

tial. An examination of the decisions on the question show that the courts generally make the distinction noted, although there may be some difficulty in reconciling their conclusions when considered with reference to the facts before them. But the case before us presents no difficulty on the latter score. While it is recited that 'this agreement is entered into subject to the approval of the owner,' it means no more than that the offer shall be accepted by the owner before it becomes obligatory. Notice of the acceptance was therefore required to bind the respondent.''

To their offer to appellant to rescind the contract, respondents received no response. Appellant's silence can not be construed as an acceptance. Mere silence when an offer is made does not constitute an acceptance of the offer. The failure to reject an offer is not equivalent to assent. *Troyer v. Fox,* 162 Wash. 537, 298 Pac. 733, 77 A. L. R. 1132.

The following language in *Columbia Malting Co. v. Clausen-Flanagan Corporation,* 3 Fed. (2d) 547, is applicable in the case at bar:

''One to whom an offer is made must either accept it or reject it. And if he does not accept it he necessarily rejects it. . . . The defendant's silence is not to be regarded as any assent upon its part. Silence is not assent, unless there is a duty to speak, and there was no such duty in this case. In Williston on Contracts, vol. 1, § 91, the rule is correctly laid down as follows:

'' 'Generally speaking, an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer.'

''That writer goes on to say that, 'even where there is no duty to speak, a line of argument which has not been formally stated in the cases may be advanced to indicate that mere silence, though unaccompanied by any act, may amount to an acceptance if the offeree requested that mode of indicating assent, and assent was intended by the offeree. When an offer is made to one who remains silent, the silence may be due to a variety

658

of causes. It is clear that, whatever may have been the offeree's state of mind, no contract can be made unless the offer stated that the offerer would assume assent in case the offeree made no reply. But if the offer does so state, the offeree's silence is ambiguous, and may doubtless be shown not to have meant assent. Certainly the offeree has the right to keep silent if he chooses without thereby becoming charged with a contract. But it is at least possible that he did mean assent, if in fact this was his meaning, there is good reason for urging that a contract has been formed.'. We do not find in this case evidence showing that the defendant by its silence meant assent. And the courts hold that, even though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance. *In re Empire Assurance Corporation*, L. R., 6 Ch., 266; *Prescott v. Jones*, 69 N. H. 305, 41 A. 352. In *Bank of Buchanan County v. Continental National Bank of Los Angeles* (C. C. A.), 277 F. 385, 390, it is said that 'one to whom an offer is made is under no obligation to do or say anything concerning an offer which he does not accept.' And in 13 Corpus Juris, 276, it is stated that 'an offer made to another, either orally or in writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, for the offerer cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance.' "

There is a complete failure of proof of acceptance by appellant of respondents' offer to rescind the contract, therefore the judgment should be reversed, and the cause remanded with direction to dismiss the action. It is so ordered.

BEALS, C. J., STEINERT, MAIN, and MITCHELL, JJ., concur.