FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY REICHERT; GARY MOYER, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>RAPID INVESTMENTS, INC., DBA Access Freedom, DBA Rapid Financial Solutions; CACHE VALLEY BANK,<br><br>*Defendants-Appellants*,<br><br>and<br><br>KEEFE COMMISSARY NETWORK, LLC, DBA Access Corrections,<br><br>*Defendant*. | No. 21-35530<br><br>D.C. No. 3:17-cv-05848-BHS<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted May 12, 2022
Portland, Oregon

Filed December 30, 2022

Before: Marsha S. Berzon and Morgan Christen, Circuit
Judges, and Frederic Block,[*] District Judge.

Per Curiam Opinion

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order denying
defendants' motion to compel arbitration, under the Federal
Arbitration Act, of claims under the Electronic Funds
Transfer Act and Washington state law.

Plaintiff Gary Moyer, who represents both a Washington
and a national class, was incarcerated three times in the
Kitsap County Jail. In each instance, the jail confiscated his
cash at booking and returned it to him in the form of a
prepaid debit card issued and serviced, respectively, by
defendants Cache Valley Bank and Rapid Investments, Inc.
(collectively, "Rapid"). Moyer was not provided an option
to receive his money in any other form. After his third
release, he used the card the day it was issued to him to

---

[*] The Honorable Frederic Block, United States District Judge for the
Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

withdraw the bulk of his balance from an ATM machine. Moyer claimed that Rapid's debit cards carried fees that violated the EFTA and Washington state law. Rapid sought arbitration pursuant to an arbitration provision in a cardholder agreement.

Rapid argued that the district court erred in determining that Moyer's retention and use of the release cards did not demonstrate, as a matter of law, his intent to accept the terms of the agreement, including the arbitration clause. Applying Washington law, the panel disagreed. Explaining that Washington law is clear that inaction in response to an offer is not acceptance, the panel wrote that Moyer's retention of the release card, prior to use, cannot constitute assent to the agreement. The panel next considered whether Moyer's subsequent *use* of the card to withdraw funds, while remaining silent, constituted assent. The panel held that because the money Moyer withdrew was his own, because the card he was issued came pre-activated and there was no other way to obtain immediate use of his own funds, and because Rapid structured its fees to begin deducting after three days regardless of use, Moyer's decision to withdraw his own money cannot reasonably be understood to manifest assent to the contract. Because Moyer did not assent to the agreement through either his receipt or use of the release card, no contract was formed. The panel therefore affirmed the district court's order denying Rapid's motion to compel arbitration and remanded for further proceedings.

## COUNSEL

George F. Verschelden (argued), Stinson LLP, Kansas City, Missouri; Emily J. Harris, Corr Cronin Michelson Baumgardner Fogg & Moore LLP, Seattle, Washington; for Defendants-Appellants.

Chris R. Youtz (argued), Richard E. Spoonemore, and Eleanor Hamburger, Sirianni Youtz Spoonemore Hamburger PLLC, Seattle, Washington; Masimba Mutamba, Palm Beach County Attorney's Office, West Palm Beach, Florida; for Plaintiffs-Appellees.

## OPINION

PER CURIAM:

Plaintiff Gary Moyer was incarcerated in the Kitsap County Jail three times. In each instance, the jail confiscated his cash at booking and returned it to him upon release not in cash or by check, but in the form of a prepaid debit or "release" card issued and serviced, respectively, by defendants Cache Valley Bank and Rapid Investments, Inc. (collectively, "Rapid"). The cards, which Moyer did not request and to which no alternative was offered, were delivered to Moyer pre-activated, and in two of the three instances began to charge maintenance fees before Moyer conducted a single transaction. After his third release, Moyer used the release card the day it was issued to him to withdraw the bulk of his balance from an ATM machine.

Moyer represents both a Washington class and a national class. He claims that Rapid's debit cards carry fees that

violate the federal Electronic Funds Transfer Act and Washington state law.  Those claims have not yet been adjudicated because Rapid moved to compel arbitration, invoking an arbitration provision in its cardholder agreement.  We hold that Moyer did not agree to the cardholder agreement or its mandatory arbitration clause.  Because acceptance is an issue of contract formation, it requires judicial resolution.  Accordingly, we affirm the district court's order denying Rapid's motion to compel arbitration.

# I

Moyer was incarcerated in the Kitsap County, Washington jail in May and December 2017 and February 2018.  In accord with Washington law, his cash was confiscated by jail officers each time he was booked.  Upon his release, Moyer received a Rapid debit card, known as a "release card," with a balance of $14.62 in May 2017, $40 in December 2017, and $95.26 in February 2018.  Moyer was not provided an option to receive his money in any other form.  In February 2018, a guard specifically instructed Moyer that if he wanted his money back, he needed to take the card.

 Each release card had a sticker affixed to the front stating: "This card has already been activated."  Text on the back of the cards advised that "[b]y accepting and or using this card, you agree to the Account Agreement."  Moyer received the Account Agreement ("Agreement") for the February 2018 card; whether he also read it on the earlier occasions is not clear.

Rapid entered two substantially similar cardholder agreements into evidence—one in use as of June 2016 and one that went into effect in February 2018.  The record is not

conclusive as to which of these agreements Moyer received with his February 2018 card.

Both versions of the Agreement begin with the following terms of acceptance:

> This Cardholder Agreement (this "Agreement") sets forth the terms of your non-reloadable prepaid Card. Please read it carefully and retain it for your records. If you do not agree to these terms, do not use the Card and cancel it by calling Customer Service at 1-877-287-2448. Otherwise, your acceptance and/or use of the Card will be evidence of your agreement to these terms.

Both agreements also have a section governing "Cancellation and Suspension," but with slightly different provisions. In the earlier (June 2016) Agreement, the "Cancellation and Suspension" term states that the cardholder "may cancel [the] Card by calling Customer Service at 1-877-287-2448" and explains that if Rapid elects to cancel or suspend card privileges "through no fault of [the cardholder's], [the cardholder] will be entitled to a refund of the remaining balance without charge." In a separate fee schedule, closing the card with check disbursement is listed as triggering a $10 fee.

The later (February 2018) Agreement contains identical language as to cancellation, but the fee for closing the account with check disbursement is $0. That Agreement also contains an additional "Consent" term absent in the prior agreement: "Individuals who believe they have received this card non-consensually will be entitled to full refund of any fees charged to the card. Individuals can claim

their full balance by visiting dailypay.me or calling the number on the back of the card." Neither Agreement specifies the length of time required to close an account and receive a disbursement check. The Agreement is clear that cardholders will not receive interest "for any amount loaded on the Card."

Both versions of the Agreement contain arbitration provisions. Capitalized text at the beginning of the document notes that the Agreement "REQUIRES CERTAIN DISPUTES TO BE RESOLVED BY WAY OF **BINDING ARBITRATION**, RATHER THAN BY JURY TRIAL." (Emphasis in original.) A later paragraph explains that:

> any controversy that arises out of or is related to (a) the Card, (b) any service relating to the Card, or (c) this Agreement, whether based on statute, contract, tort or any other legal theory, in which the aggregate amount in controversy for all claimants exceeds $15,000, including interest and attorneys' fees, (any "Claim") will be settled on an individual basis by binding arbitration under the Federal Arbitration Act ("FAA").

The arbitration provision further specifies: "Any dispute regarding whether a particular controversy is subject to arbitration will be decided by the arbitrator(s)."

The Agreement details a $2.50 per week maintenance fee the company deducts automatically "begin[ning] 3 calendar days after the Card is issued." ATM withdrawals incur a fee of $2.95 per transaction. In May and December 2017, maintenance fees were charged on the third calendar day

after the cards were issued.  Moyer had not yet used either card to withdraw funds.  In February 2018, Moyer used the card on the day of his release to withdraw $80 from an ATM, incurring a $2.95 fee.  Moyer was charged the first "[p]eriodic maintenance fee" on that card three days later, followed by additional weekly maintenance fees over the following four weeks, exhausting his remaining $12 balance.

The lawsuit leading to this appeal was filed as a putative class action by Jeffrey Reichert.  Like Moyer, Reichert received a Rapid debit card upon his release from the Kitsap County Jail.  Unlike Moyer, he denied having received any cardmember agreement with his card.

Rapid moved to compel arbitration because the classwide damages requested exceed the $15,000 threshold contained in the arbitration agreement.  Noting that Reichert claimed not to have received the Agreement containing the arbitration clause, the district court denied the motion. Reichert then moved to certify a class.  The district court granted the motion but conditioned class certification on the addition of a plaintiff who had received the Agreement. Moyer was added as a named plaintiff to satisfy that condition.

Rapid moved to compel arbitration of Moyer's claims. The district court denied the motion "for the reasons recited in the Court's prior Order Denying Motion to Compel Arbitration."  The court found that Moyer's claims were identical to Reichert's "in all material respects."  Rapid appealed, and another panel of this court held that it was "unclear whether the district court properly considered all relevant facts and circumstances specific to Moyer— particularly because there was no declaration from Moyer in the record."  *Reichert v. Rapid Invs., Inc.*, 826 F. App'x 656,

657 (9th Cir. 2020).  Our court vacated the district court's order denying the motion to compel arbitration and remanded the case, declining to "express any views on whether a valid, enforceable agreement exists." *Id.* at 658.

On remand, the district court focused on whether Moyer had accepted an offer to enter into the Agreement, concluding that "Moyer's use of the card did not constitute assent to [the] contract."  The district court reasoned that under Washington law, neither Moyer's silence nor his failure to cancel the card according to the terms of the Agreement could be considered an acceptance.

Based on that reasoning, the district court denied the motion to compel arbitration.  Rapid timely appealed.

## II

### A.

"We review the district court's decision on a motion to compel arbitration *de novo.*"  *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 917 (9th Cir. 2011)*.*  "We also review the validity and scope of an arbitration clause *de novo*."  *Id.*  "We review the factual findings underlying the district court's decision for clear error."  *Id.*

The Federal Arbitration Act ("FAA") provides that arbitration clauses in commercial contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

At the same time, the FAA "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Accordingly, the FAA "does not require parties to arbitrate when they have not agreed to do so," *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989), and a court may order a dispute to arbitration only if, under the applicable principles of state contract law, "the court is satisfied that the parties agreed to arbitrate that dispute," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) (original emphasis omitted). Courts thus retain the responsibility to determine the threshold issue of whether an enforceable contract exists. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir. 1991).

The type of objection to arbitration determines whether the issue is for the arbitrator or the court. Questions regarding the *validity* or *enforceability* of a contract, unless they relate specifically to the arbitration clause, are for the arbitrator to decide. *See Rent-A-Center*, 561 U.S. at 72; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967). By contrast, "[i]t is . . . well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co.*, 561 U.S. at 296; *see also Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) ("[C]hallenges to the very existence of the contract are, in general, properly directed to the court."). Moyer's challenge to the Agreement as a whole for lack of acceptance and consideration—elements of contract *formation*—is thus a matter to be determined by a court.

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options,* 514 U.S. at 944). The parties agree that Washington law governs. Rapid, as the party seeking to compel arbitration, must prove by a preponderance of the evidence that the parties formed an agreement to arbitrate. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

## B.

The formation of a contract in Washington requires mutual assent to sufficiently definite terms, as well as consideration. *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) (en banc); *see also Yakima Cnty. (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 858 P.2d 245, 255 (Wash. 1993). Moyer argues that he did not enter into a valid contract with Rapid in February 2018 when he received the Agreement because he did not assent to any of its terms and, alternatively, because the contract lacks consideration. We first consider assent. Like the district court, we concentrate on the February 2018 transaction because in only that instance is it undisputed that Moyer received an Agreement with the release card.

Washington follows the objective manifestation theory of contract, which "lays stress on the outward manifestation of assent made by each party to the other." *City of Everett v. Sumstad's Est.*, 631 P.2d 366, 367 (Wash. 1981). Under this approach, the court "impute[s] an intention corresponding to the reasonable meaning of a person's words and acts." *Id.* "The subjective intention of the parties is irrelevant." *Id.* Mutual assent is ordinarily a question of

fact but may be determined as a matter of law "if reasonable minds could not differ." *P.E. Systems, LLC v. CPI Corp.*, 289 P.3d 638, 643 (Wash. 2012). Rapid argues that the district court erred in determining that Moyer's retention and use of the release cards did not demonstrate, as a matter of law, his intent to accept the terms of the Agreement, including the arbitration clause. We disagree.

First, Moyer's retention of the release card, prior to use, cannot constitute assent to the Agreement. Washington law is clear that inaction in response to an offer is not acceptance. *See Roethemeyer v. Milton*, 33 P.2d 99, 101 (Wash. 1934) ("The failure to reject an offer is not equivalent to assent."). The terms of the Agreement specify assent through "acceptance and/or use" but the offer cannot abrogate Washington law. "[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance." *Id.* at 102 (quoting *Columbia Malting Co. v Clausen-Flanagan Corp.*, 3 F.2d 547, 551 (2d Cir. 1924)); *see also* Restatement (Second) of Contracts § 69, cmt. c ("The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting.").

Nor was Moyer under a duty to act—the "exceptional" circumstance in which silence or inaction may constitute acceptance. *Bybee Farms, LLC v. Snake River Sugar Co.*, 625 F. Supp. 2d 1073, 1083 (E.D. Wash. 2007) (citing the Restatement (Second) of Contracts § 69); *see Roethemeyer*, 33 P.2d at 101 ("Silence is not assent, unless there is a duty to speak . . . ." (quoting *Columbia Malting Co.*, 3 F.2d at 551)). Such a duty may arise where the offeree "encourage[s]" the offeror to view silence as acceptance. *Id.*

A duty to reject an offer may also arise where state law imposes a duty to act, a prior course of dealing between the parties makes assent by silence reasonable or expected, or the offeree retains a benefit "by failing to act." *Norcia v. Samsung Telecomm. America, LLC*, 845 F.3d 1279, 1285–86 (9th Cir. 2017) (applying a similar California contract law principle to hold that the purchaser of a phone did not have a duty to "opt out" of an arbitration agreement to avoid assent where no California law imposed a duty, no prior course of dealing existed between the parties "that might impose a duty on [the plaintiff] to act," and the plaintiff retained no benefit from failing to act); *see also* Restatement (Second) of Contracts § 69, cmt. a (noting two "exceptional" cases in which silence may be taken as acceptance: (1) "those where the offeree silently takes offered benefits" and (2) when a party relies on the other party's manifestation of intention that silence may indicate acceptance).

Here, Moyer did not encourage Rapid to consider his silence to be acceptance.  Moyer did not request or choose the release card as the means to regain his money and had no pre-contract communication with Rapid.  Moyer also did not engage in a prior course of dealings that would have imposed on him a duty to act and did not retain a benefit simply by leaving the jail with the card and the Agreement in hand. Accordingly, no exceptional circumstances placed a duty on Moyer to act affirmatively in response to Rapid's offer. Because Moyer's receipt and retention of the release card did not objectively manifest assent, no contract was formed at the time Moyer exited the jail with the card or when he retained the card prior to use.

We next consider whether Moyer's subsequent *use* of the card to withdraw funds, while remaining silent, constituted assent to those terms, including the arbitration provisions.

We hold that because the money Moyer withdrew was his own, because the card he was issued came pre-activated and there was no other way to obtain immediate use of his own funds, and because Rapid structured its fees to begin deducting after three days regardless of use, Moyer's decision to withdraw his own money cannot reasonably be understood to manifest assent to the contract.

Under Washington's objective manifestation rule, conduct may constitute acceptance when the "reasonable meaning" of a person's actions is to assent to the offer. *Plumbing Shop, Inc. v. Pitts*, 408 P.2d 382, 384 (Wash. 1965). The reasonable meaning of a party's actions depends on the "outward manifestations *and circumstances* surrounding the transaction." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 492 (Wash. 2020) (emphasis added); *see also Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1166 (Wash. Ct. App. 2007) (noting that "[t]he existence of mutual assent may be deduced from the circumstances" including "the ordinary course of dealing between the parties"). Commentary to the Restatement similarly emphasizes the importance of context when determining whether conduct constitutes assent:

> Like words, non-verbal conduct often has different meanings to different people. Indeed, the meaning of conduct not used as a conventional symbol is more uncertain and more dependent on its setting than are words. A wide variety of elements of the total situation may be relevant to the interpretation of such conduct.

Restatement (Second) of Contracts § 19, cmt. a. Thus, the circumstances surrounding an offer determine the meaning that may be reasonably imputed to a party's actions in response.

Turning to the circumstances of this offer, like other individuals who have been released from jail or prison and given prepaid debit cards, Moyer was presented with a release card as the only way for him to receive *his own* confiscated money. *See e.g.*, *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 573 (9th Cir. 2020); *Pope v. EZ Card & Kiosk LLC*, No. 15-61046-CIV, 2015 WL 5308852, at *1 (S.D. Fla. Sept. 11, 2015); *cf. Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1364 (N.D. Ga. 2015), *aff'd*, 608 F. App'x 895 (11th Cir. 2015). Additionally, in February 2018, as on the occasions in 2017, the card Moyer was issued was given to him already activated and Rapid began to deduct maintenance fees of $2.50 per week after three days regardless of whether Moyer used the card. Indeed, when Moyer was issued cards in May and December 2017, Rapid charged maintenance fees before any withdrawal. These fees significantly reduced the amount of Moyer's funds that he was able to reclaim from the jail. In December 2017, half of the money deposited onto Moyer's release card was consumed by maintenance fees. In May 2017, fees reduced the original $14.62 deposited to the card by one third.

Finally, the ambiguity of the terms governing a cardholder's decision to request his balance through a check, as opposed to withdrawal, further explains Moyer's decision to use the card to withdraw his funds. Neither Agreement specified how long it would take to close the release card account and receive a check.

In sum, Moyer was presented with one option to retrieve his own money right away—a withdrawal via an ATM. His money would be reduced by significant increments each week Moyer retained, but did not use, the card. Withdrawing the money presented a more immediate way to access the funds than any alternative presented in the fine print Agreement. And Moyer was under no obligation to follow an alternative process, having not assented to the Agreement's terms through retention of the card. Under these circumstances, reasonable minds could not find that Moyer objectively manifested assent to the terms of the Agreement by using the card to obtain his own money. *See City of Everett*, 631 P.2d at 367.

Rapid argues that regardless of context, Moyer retained a "benefit"—disbursement of funds through use of the card—and therefore manifested assent by withdrawing funds. When a party accepts a benefit or services from another in circumstances in which it is clear the other party expects compensation or has imposed particular terms, the party has assented to those terms. *See Jones v. Brisbin*, 247 P.2d 891, 894 (Wash. 1952). Indeed, "[i]t is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).

In Washington, however, acceptance of a benefit does not constitute assent unless the offeree has been presented a "reasonable opportunity to reject [the] offered services." *Jones*, 247 P.2d at 894. The Restatement enunciates the same requirement, stating that acceptance of an offer may be inferred "[w]here an offeree takes the benefit of offered

services *with reasonable opportunity to reject them* and reason to know that they were offered with the expectation of compensation." Restatement (Second) of Contract § 69(1)(a) (emphasis added).

An offeree has been provided with a reasonable opportunity to reject services or a benefit when, for instance, the services or benefit are provided over a period of time in which communication between the parties is regular and objection to or clarification of terms is possible. For example, in *Jones v. Brisbin*, a builder solicited plans from an architectural firm over a three-month period of negotiations in which he provided sketches and other detailed requests to the firm and met with the firm's representatives in person three or four times. *Jones*, 247 P.2d at 892. The Washington Supreme Court held that the builder's subsequent receipt and submission of fully completed architectural plans to government officials was a benefit the builder accepted after a reasonable opportunity to reject and so constituted acceptance of a contract for architectural services. *Id.* at 893–94. *Hoglund v. Meeks* similarly affirmed a trial court's determination that a lawyer's acceptance of another attorney's work product constituted assent where that attorney had been involved throughout the case, and the attorneys had a long professional relationship with fee-splitting agreements under similar circumstance. 170 P.3d 37, 46–47 (Wash. Ct. App. 2007).

Here, insofar as Moyer accepted a benefit, the lack of any "reasonable opportunity" to reject the card services defeats an inference of assent. *Jones*, 247 P.2d at 894. Unlike the offerees in *Jones* or *Hoglund*, who affirmatively solicited and negotiated the benefits they later accepted, Moyer did not request that his money be delivered through the prepaid

release card and did not negotiate with Rapid in person, by phone, or in writing. *Jones*, 247 P.2d at 892; *Hoglund*, 170 P.3d at 46–47. Nor did Moyer receive the alleged benefit over a period of time comparable to the months and years during which the parties interacted in *Jones* and *Hoglund*. Rather, Rapid structured its card agreement such that maintenance fees would begin after three days, drastically shortening the time Moyer had to act before losing his own money.

A final critical factor that distinguishes this case from *Jones* and *Hoglund* is that in those cases, rejection of services would incur no penalty for the offeree—the offerees faced no financial fees or loss of personal property in rejecting the services at issue. *Jones,* 247 P.2d at 892; *Hoglund*, 170 P.3d at 46–47. Moyer, by contrast, faced an ambiguous cancellation provision with unclear expense and timing, one that was undoubtedly more costly and time-consuming than opting out of the card *before* it was issued, an option Moyer was not provided. Instead, Moyer had three options: (1) to abstain from using the card to reject services—a total forfeit of his own money; (2) to cancel the card and request his money—an option that would incur a wait of at least several days without any access to funds; or (3) to use the card, incurring withdrawal fees but recovering the bulk of his funds. The financial penalties of "rejecting" the benefit in this circumstance, coupled with a lack of established communication with Rapid and a compressed timeline in which to act, make the opportunity available to Moyer to reject the benefit unreasonable, precluding an inference of assent through his use of the card.

Contrary to Rapid's argument, these same distinctions make cases emerging from the consumer credit card context inapplicable here. *See, e.g.*, *Discover Bank v. Ray*, 162 P.3d

1131, 1132–33 (Wash. Ct. App. 2007); *Schmidt v. Samsung Elecs. Am., Inc.*, No. C16-1725-JCC, 2017 WL 2289035, at *3 (W.D. Wash. May 25, 2017). We agree with the district court that cases about consumer credit card disputes, in which individuals take affirmative steps to order and apply for cards, check boxes accepting terms and conditions, and use the cards over a period of time (often years), do not support the conclusion that Moyer accepted a benefit with reasonable opportunity to reject services. *See Regan*, 85 F. Supp. 3d at 1364 (rejecting the applicability of such consumer credit card cases to a determination of contract formation in the context of jail and prison prepaid debit cards).

Moreover, it is not clear that Moyer accepted a benefit. In contrast to situations in which a party accepted services or work product from another party, the money Moyer received was his own. *See Jones*, 247 P.2d at 893–94 (holding that the receipt and use of fully detailed architectural plans was a benefit given in circumstances which would indicate the benefit was given with expectation of compensation); *Hoglund*, 170 P.3d at 46–47 (holding that substantial evidence supported the trial court's finding that retention of attorney work-product created a reasonable expectation of payment).

The "benefit" of using prepaid debit cards is to allow the Kitsap County Jail to avoid directly disbursing money to people exiting incarceration. "For local governments, handling inmates' cash is expensive and time consuming." *Brown*, 953 F.3d at 569. For Rapid, the cards provide the ability to levy significant maintenance and use fees. It would be odd to assign the "benefit" of the release card to Moyer. More accurately, the cost of administering the disbursement of money Moyer was legally owed was effectively

transferred to him by the jail's choice to use release cards. Imposing that obligation on him is hardly a benefit.

Because Moyer did not assent to the Agreement through either his receipt or his use of the release card, no contract was formed. We do not consider whether the contract fails for lack of consideration.

## III

In sum, we hold that Moyer did not accept Rapid's cardmember agreement and the arbitration clause it contained. We therefore affirm the district court's denial of Rapid's motion to compel arbitration and remand for further proceedings.

**AFFIRMED.**